*In re* JOSÉ A. LAVASTIDA, RAMÓN MORÁN LOUBRIEL, LUIS E. COLÓN RAMERY, VÍCTOR M. CAPARRÓS CABRERA y ATHOS CASTRO CROS, querellados.

*Números:* O-76-86     *Resueltos:* 16 de julio de 1979
O-76-87
O-76-90
O-76-92
O-76-94

*Héctor A. Colón Cruz, Procurador General* y *Héctor Rivera Cruz, Fiscal Auxiliar del Departamento de Justicia,* abogados de El Pueblo; *Abrahán Díaz González,* abogado del Lic. José A. Lavastida; *Marcos A. Ramírez* y *Marcos A. Ramírez Lavandero,* abogados del Lic. Ramón Morán Loubriel; *Ramón A. Cancio,* abogado del Lic. Luis E. Colón Ramery; *Rafael A. Escudero Bonilla* y *Celestino Matta Méndez,* abogados del Lic. Víctor M. Caparrós Cabrera; *Rafael Hernández Matos, José M. Sagardía Pérez* y *Antonio Zapater Cajigas,* abogados del Lic. Athos Castro Cros.

SENTENCIA

Considerada la prueba, el Informe del Comisionado, las objeciones al mismo formuladas por los querellados y como resultado de la votación efectuada, se dicta sentencia en los casos de epígrafe con sujeción a los siguientes pronunciamientos:

1. Se suspende indefinidamente al querellado José A. Lavastida del ejercicio del notariado, y, del ejercicio de la abogacía, por el término de un año. El Juez Asociado Señor Díaz Cruz limitaría la sanción al ejercicio del notariado por un término de un año y el Juez Asociado Señor Negrón García lo separaría indefinidamente del ejercicio de la abogacía.

2. Se censura al abogado Ramón Morán Loubriel. El Juez Asociado Señor Negrón García lo separaría del ejercicio de la abogacía.

3. Se suspende al querellado Luis E. Colón Ramery del ejercicio del notariado por el término de seis meses. El Juez Asociado Señor Díaz Cruz limitaría la sanción a una amonestación o censura; el Juez Asociado Señor Negrón García lo suspendería del ejercicio de la abogacía.

4. Se suspende al querellado Víctor M. Caparrós Cabrera indefinidamente del ejercicio del notariado. El Juez Asociado Señor Díaz Cruz limitaría la sanción a un término de seis meses y el Juez Asociado Señor Negrón García lo suspendería del ejercicio de la abogacía.

5. Se suspende al querellado Athos Castro Cros indefinidamente del ejercicio del notariado. El Juez Asociado Señor Díaz Cruz limitaría la sanción a un término de seis meses; el Juez Asociado Señor Negrón García lo suspendería del ejercicio de la abogacía.

Así lo pronunció y manda el Tribunal y certifica el Secretario. Los Jueces Asociados Señores Martín y Díaz Cruz emitieron sendas opiniones disidentes. El Juez Asociado Señor Irizarry Yunqué emitió opinión a la cual se une el Juez Asociado Señor Torres Rigual. El Juez Asociado Señor Negrón García emitió opinión concurrente y disidente

haciendo constar que, en adición a las sanciones disciplinarias decretadas, suspendería a todos los querellados del ejercicio de la abogacía durante determinados períodos proporcionados a la gravedad de las actuaciones de cada uno; el Juez Presidente Señor Trías Monge y los Jueces Asociados Señores Rigau y Dávila se inhibieron.

(Fdo.) Ernesto L. Chiesa

*Secretario*

—O—

Opinión disidente emitida por el Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 16 de julio de 1979

Con inescrutable laconismo y blando criterio el Tribunal impone hoy tibias sanciones a un grupo de profesionales contra los cuales se presentó querella sobre violaciones a los cánones de ética que rigen la práctica de la abogacía, interpretando, a mi juicio equivocadamente, que se trata de violaciones a la Ley Notarial. Condona así esta Corte conducta que hubo de oscilar entre la flagrante y sistemática falsedad en unos casos, hasta la mansa quietud en situaciones que requerían celosa diligencia. Las actuaciones de los querellados, aunque dispares, tienen un tipo común que las agrupa, cual es, el absoluto desinterés por la suerte de los derechos de personas que depositaron directa o indirectamente su confianza en la integridad profesional de cada uno de ellos.

I

La conducta punible que se imputa a los querellados gira en torno de la gestión comercial realizada en Puerto Rico por First Conventional Investment Corporation (en adelante "First Conventional") en relación con el financiamiento de proyectos residenciales y el corretaje de hipotecas. Ostentaba la representación legal de la corporación el bufete de abogados Blanco Lugo, Morán y Lavastida del cual eran socios los

querellados Ramón Morán Loubriel y José A. Lavastida, siendo abogado asociado el querellado Víctor M. Caparrós Cabrera([1]) y abogado empleado el querellado Luis E. Colón Ramery. Las tareas en el bufete se encargaban principalmente a los abogados según la experiencia profesional que cada uno tuviera. Durante el período pertinente para la solución del caso de autos el Lcdo. Blanco Lugo atendía principalmente el área de la litigación, el Lcdo. Morán lo referente a problemas contributivos y corporativos y el Lcdo. Lavastida lo relacionado con notaría coadyuvado en este respecto por los licenciados Caparrós Cabrera y Colón Ramery.

El servicio que el bufete prestaba a First Conventional y sus subsidiarias era amplio y abarcador. Incluía todo tipo de consulta y asesoramiento general sobre cualquier aspecto del negocio del cliente en que su consejo fuera requerido, incluyendo asuntos corporativos, contributivos, administrativos y de financiamiento. Ese servicio comprendía consultas sobre la operación necesaria para levantar fondos, todo asunto relacionado con litigación, así como todo trabajo notarial relacionado con sus negocios, que cubría la redacción y otorgamiento de todo tipo de escrituras y documentos relacionados con el financiamiento de terrenos destinados al desarrollo y construcción de viviendas, tales como escrituras de compraventa, segregación de solares, liberación de gravámenes y constitución de hipotecas. En fin, todo aspecto legal del negocio de First Conventional era servido por la firma Blanco Lugo, Morán y Lavastida. Prácticamente todas las escrituras que debía otorgar First Conventional y sus subsidiarias eran otorgadas a través del bufete, no contando dichas corporaciones con otra representación legal.

Entre las escrituras otorgadas en el bufete donde ejercían los querellados estaban incluidas las escrituras de liberación del gravamen hipotecario original sobre las fincas objeto de desarrollo que, como consecuencia del financiamiento

---

([1])Recibía por este concepto un sueldo y además un beneficio adicional cada año.

necesario para la construcción de proyectos residenciales, gravaba a cada solar de dichas fincas. En el Bufete Blanco Lugo, Morán y Lavastida dicha liberación se otorgaba en la misma escritura contentiva de la compraventa de la propiedad y donde además se constituía primera hipoteca a favor de la institución que habría de ofrecer financiamiento permanente para dicha adquisición, teniéndose por costumbre hacer las liberaciones del gravamen original en algún momento posterior al otorgamiento de los restantes negocios, pero dentro del día natural en que se llevaran a cabo los mismos.

Todo marchó bien hasta mediados de 1973 cuando First Conventional encaró problemas financieros. La liquidez y solvencia de la corporación se tornó crítica, razón por la cual ésta no pudo hacer los pagos que eran de rigor a los acreedores hipotecarios que prestaron el financiamiento original. Consiguientemente negáronse éstos a liberar las propiedades que se iban vendiendo, transcurriendo el plazo fatal prescrito para completar las comparecencias escriturarias sin que las liberaciones se realizaran.

La falta de comparecencia del acreedor hipotecario original para liberar la propiedad vendida del gravamen general a que estaba afecta, hacía que se tornaran írritas para cualquier propósito práctico las transacciones de compraventa efectuadas. Resalta con brillantez el hecho indubitado de que una propiedad que se vende por $25,000, tiene miserable utilidad gravada con hipotecas que sobrepasan los dos millones de dólares.

Este fue el caso que surgió en la venta de 10 casas del proyecto Jardines de Villa del Carmen, cuando habiendo ya comparecido comprador y vendedor ante el querellado Lic. Caparrós, los acreedores hipotecarios se negaron luego a liberar las propiedades vendidas del gravamen que la sujetaba procediendo entonces dicho querellado a anotar impropiamente al pie de las escrituras, después de haber firmado las partes, las siguientes expresiones:

"Doy fe de que en la fecha de su otorgamiento, luego de firmar

ante mí las personas cuyas firmas anteceden, requerí de Home Title Agency of Puerto Rico, Inc. y del Banco de Economías y Préstamos, las respectivas firmas en esta escritura a los fines de las liberaciones a que esta escritura se refiere, manifestándoseme que las mismas no podían ser efectuadas por no habérseles pagado las sumas pactadas para dichas liberaciones. En vista de ello, extiendo esta diligencia para que quede constancia a todos los efectos legales procedentes de que la comparecencia de Home Title Agency of Puerto Rico, Inc. y del Banco de Economías y Préstamos se deben entender por no puestas en esta escritura."

La nota transcrita fue adicionada en dichas escrituras sin que se diera aviso de la misma a los compradores, ni se tomaran las providencias para la anulación o aclaración de las escrituras, pues el notario no debe hacer salvedades luego de haber firmado las partes, a menos que éstas firmen nuevamente.

Como profesional que es del derecho—en su carácter de abogado—el querellado tenía la obligación afirmativa e ineludible de comunicar a las partes que comparecieron que habíase frustrado la finalización de las escrituras por haberse negado a liberar el acreedor hipotecario original. Obligación que trasciende el ámbito estrictamente notarial ya que no solamente cumplíase una formalidad de este orden, sino que se apelaba a la obligación profesional de advertir prontamente a un cliente de que sus derechos han quedado seriamente perjudicados. Máxime en el caso de autos donde, como hemos visto, el propio abogado hizo manifestaciones a dicho cliente que contribuyeron a disipar en él cualquier duda sobre la seguridad del negocio. El abogado y notario no sólo es responsable ante el cliente poderoso; al cliente modesto le debe la misma o mayor consideración. El silencio del querellado ante los adquirentes traicionó la fidelidad que les debía. En *In re Meléndez Pérez*, 104 D.P.R. 770, 775 (1976),[2]

---

[2]Aun desde una perspectiva estrictamente notarial, debió saber el querellado que las expresiones que consignó al pie de las escrituras incompletas, resultan totalmente inadecuadas como medida para enfrentar la situación que se suscitó. El notario, luego de notificar a las partes, debió levantar un acta anulando dicha escritura.

el Tribunal, con gran sentido de la obligación del notario, como abogado que es ante todo, expresó lo siguiente: "¿Cómo guardar silencio ante una situación lesiva para cualquiera de los otorgantes, si su entrenamiento legal le hace testigo de la irregularidad? ¿Para qué otra cosa sirve su profesión de abogado por ley puesta a disposición de las partes en su despacho notarial? En su deber de ilustrar y dar consejo legal a las partes contratantes, no hay guardarraya que separe al notario del abogado." La conducta del querellado Lic. Caparrós requiere que se le suspenda del ejercicio de la profesión. El querellado Lic. Lavastida, quien dirigió todo el proceso y quien continua y directamente estuvo enterado de la situación y permaneció anuente cuando debió proveer en contrario, debía suspenderse también del ejercicio de la profesión.

## II

Para enfrentar la experiencia precedentemente descrita en relación con los otorgamientos de las escrituras de la Urbanización Jardines de Villa del Carmen ante Caparrós que imposibilitó la liberación de los gravámenes hipotecarios, junto a otras experiencias análogas en distintos proyectos en desarrollo, hubo de decidir el bufete efectuar un cambio en el proceso de otorgamiento y en la redacción de las escrituras de First Conventional que habrían de otorgarse en adelante. El cambio se siguió en relación con las ventas que luego se efectuaron de propiedades comprendidas en las Urbanizaciones "Jardines de Villa del Carmen" y "Moca Gardens". Dicho cambio consistió en otorgar escrituras distintas y separadas para los actos de segregación y compraventa y la liberación de la hipoteca original. En su consecuencia el nuevo modelo omitió la comparecencia de los acreedores hipotecarios, excluyéndose por tanto la referencia a la liberación en el título de la escritura. Se incluyó entonces en dicha escritura de segregación y compraventa una inusitada disposición que pasó a ser el párrafo Noveno, cuya redacción

fue instrumentada a través de Lavastida y Caparrós, con el siguiente texto:

"First Conventional Investment hace constar que los tenedores de los gravámenes relacionados en el párrafo Primero en la sección de Títulos y Cargas de esta escritura no comparecen a liberar de dichos gravámenes el solar segregado mediante este acto, por lo que el mismo permanece afecto a dichos gravámenes hasta que por documento público por separado se lleven a efecto las liberaciones, a lo cual se compromete First Conventional Investment Corp."

Lo que realmente sorprende del nuevo párrafo aludido es que pretende contener una aseveración del cliente del Bufete Blanco Lugo, Morán y Lavastida, sin que compareciera como parte en la escritura. De suerte que el compromiso de First Conventional de realizar las liberaciones por documento público separado no es otra cosa que una inoficiosa aseveración hecha exclusivamente por el notario autorizante, quien sólo puede dar fe de los dichos de las partes y de las circunstancias del otorgamiento que exige la Ley Notarial. El querellado Caparrós otorgó ocho de estas escrituras; el querellado Colón Ramery otorgó trece.

La actuación de dichos abogados constituye una práctica contraria a los cánones de ética profesional. Es inconcebible que pueda otorgarse una escritura en la que se plasmen obligaciones de personas que no comparecen como partes en el documento. Triste y penoso porvenir le aguardaría al ejercicio de la abogacía si permitiéramos que su ejercicio descendiese hasta el punto en que, desnaturalizado, el notario pudiera trascender de su función afianzadora, para convertirse en portavoz de un tercero ausente del acto notarial.

Esa falta no se circunscribe a la esfera notarial, sino que trasciende a la del abogado que en el ejercicio de su profesión no puede inducir a error a las partes que ante él comparecen.

Los problemas que dieron lugar a la adopción de la nueva forma de escritura advirtieron a todos los querellados de la precaria situación financiera de First Conventional. La crítica situación financiera de First Conventional, que presentaba

serias dificultades en la venta de sus proyectos por falta de recursos para liberarlos de los gravámenes a que estaban afectos, redundaba en perjuicio para los adquirentes individuales de hogares quienes debían recibir sus propiedades libre de cargas; y por ende, acarreaba un fundamental problema para los notarios que no podían obtener las liberaciones de los acreedores hipotecarios dentro del día natural de efectuarse la compraventa.

Comoquiera que el problema que pretendían corregir los abogados al cambiar el sistema de otorgamiento de escrituras a actos separados, lo único que facilitaba era el que se otorgara la segregación y compraventa sin que necesariamente se otorgara la liberación de hipoteca, y resultando que esta última, al igual que ocurría durante el procedimiento anterior de un solo otorgamiento, tampoco se otorgaba, el cambio resultó inútil y resultaba engañoso para los compradores. Lamentablemente la solución habría de levantarse sobre la ruina de los derechos de los compradores de hogares individuales que quedarían a merced de la suerte financiera de First Conventional que ya anunciaba su descalabro con el conocimiento de todos los abogados querellados. En este cuadro el referido párrafo noveno resalta tenebrosamente al contener una representación jurídicamente fútil e inservible que intentaba desvanecer subrepticiamente cualquier duda que se suscitara en el incauto comprador con respecto a los gravámenes que pesaban sobre la propiedad que adquiría. ¿Acaso de invertirse el esquema, y ser los querellados los abogados de los compradores hubiéranle recomendado a éstos adquirir las propiedades en tan inciertas circunstancias? La contestación a esta interrogante no debe variar respecto al abogado independientemente de a quién represente. La falta de imparcialidad de los querellados, señores Caparrós, Colón y Lavastida, ha quedado de manifiesto. En ocasiones, declaró Caparrós que le preguntaban: 'Licenciado, qué son esos millones que aparecen ahí." Él les respondía que "son los gravámenes de la finca principal de la que se segrega en este

acto." Les hacía entonces la aclaración de que en ese acto no se liberaban los mismos. Colón procedía en términos similares. Ahora, ¿es acaso suficiente esa aseveración fáctica, o, se espera del abogado, técnico del derecho, adicional asesoría? La contestación es evidente. Permitir lo primero, sería convertir el consultorio notarial en incierto laberinto donde la media verdad y la simulación se podrían combinar para burlar los derechos del confiado y desprevenido compareciente.

Tal situación fue encarada por el Tribunal recientemente en *In re Meléndez Pérez,* supra, y con gran claridad se dijo lo siguiente:

"... El consejo del abogado notario debe guiar la redacción del documento público y dar luz en el acto final de otorgamiento.

La función del notario trasciende el acto externo de legalización de unas firmas. Presupone la creación de un nivel de entendimiento y comunicación entre el fedante y los otorgantes que le permite a éstos formar una racional conciencia del acto en que concurren. La fe pública notarial tiene como base la voluntad ilustrada de los contratantes; no puede ser fruto de la ignorancia y la obscuridad. El notario, principal instrumento de la fe pública, tiene la indeclinable obligación de propiciar y cerciorarse de ese estado de conciencia informada supliendo las explicaciones, aclaraciones y advertencias en todo caso en que hagan falta para lograr el consentimiento enterado de los otorgantes al acto notarial. ..." Págs. 775–776.

Los querellados Lics. Lavastida, Caparrós y Colón incurrieron en grave desatención de sus deberes profesionales que requieren su suspensión del ejercicio de la abogacía.

### III

La responsabilidad del Lcdo. Morán en la situación señalada está fundada en su falta de diligencia ante los hechos conocidos por él, los que claramente eran peligrosos de su faz. Esto queda reflejado en su contestación a la querella, en la que expone:

"Allá para julio o agosto de 1973 el Licenciado Morán fue informado por los licenciados Lavastida y Blanco Lugo que había

habido problemas cuando en una sola escritura se incluían los actos de segregación, liberación y compraventa. Se le explicó que el problema consistió en que en algunas de esas escrituras no compareció a liberar la persona que debió hacerlo dentro de las 24 horas del día en que fueron otorgadas. Al mismo tiempo se le informó de las dificultades ocurridas, el Licenciado Morán fue informado por los licenciados Lavastida y Blanco Lugo, que se habían subsanado las dificultades apuntadas y que ya habían sido firmadas las liberaciones pertinentes. Se le informó igualmente que para evitar la repetición de la dificultad y evitarle problemas al notario otorgante, los socios informantes habían tomado la determinación de que de ahí en adelante la compraventa y la liberación se harían en escrituras separadas."

La única inferencia que puede hacerse de la situación planteada al Lcdo. Morán sugiere que su cliente First Conventional estaba en una situación de estrechez económica que le impedía efectuar las liberaciones de la hipoteca simultáneamente con la segregación y compraventa de las propiedades individuales. Tal situación no se corregía con la separación de los actos escriturarios. El reducido número de socios y de abogados en el bufete hace creer que era inescapable su conocimiento de los problemas financieros de uno de sus principales clientes.

Así advertido, el querellado Lic. Morán tenía una obligación afirmativa ineludible de tomar las diligencias que fueran de rigor ante sus compañeros socios y ante cualquiera otro abogado para asegurarse de que los derechos de los adquirentes no quedasen menoscabados al quedar dependientes de la ya notoriamente infausta suerte económica de First Conventional.

No se trata de imponer responsabilidad profesional al socio de una firma de abogados por actuaciones de un subordinado sobre las cuales no tenía razonablemente control ni conocimiento. Se trata, en cambio, de exigir aquellas medidas insoslayables que debe tomar un abogado para asegurarse de que los ciudadanos que acuden a su bufete puedan descansar en la buena fe de los abogados que allí

ejercen. La inacción del Lic. Morán para corregir una situación tan delicada para su bufete y perjudicial para las partes, le inculpa profesionalmente.

## IV

El querellado Lic. Athos Castro Cros, no era abogado del Bufete Blanco Lugo, Morán y Lavastida. Se relaciona con el caso por su intervención notarial respecto a la urbanización Jardines de Coamo en la que First Conventional tenía intereses en el otorgamiento de la gran mayoría de las escrituras de segregación, liberación y compraventa de solares de dicho proyecto. El querellado Lic. Caparrós también otorgó una escritura relativa a dicho proyecto similar a las otorgadas por Castro Cros. Castro preparó el modelo de dichas escrituras remitiéndole copia a Lavastida. En el modelo preparado se expresaba incorrectamente la cuantía del gravamen hipotecario del cual habrían de liberarse los solares a venderse, así como el tenedor del pagaré hipotecario. Se refería a un pagaré inexistente de $3,712,500 que ya se había cancelado y taladrado ante el notario Lavastida, quien lo tenía en su posesión, y habíase ya sustituido por otro de $4,416,720, garantizados el uno y el otro por hipoteca sobre la finca que comprendía el proyecto. Lavastida no advirtió, sin embargo, ni a Castro ni a ningún miembro del bufete sobre el error cometido, especialmente habiendo sido el notario que intervino en la sustitución de dichos pagarés.

Pero más grave aún es el hecho de que en las escrituras relacionadas con dicho proyecto, Coamo Gardens, hicieron constar los Lcdos. Castro Cros y Caparrós en sus respectivas intervenciones como notarios que First Conventional comparecía como tenedora del referido pagaré inexistente de $3,712,500, y que en consideración al pago de $500 ésta liberaba de la hipoteca referida el solar segregado y vendido a cada uno de los compradores; expresando falsamente ambos notarios que el representante de First Conventional les había mostrado el referido pagaré y que hicieron en sus respectivas

intervenciones, la correspondiente anotación de liberación sobre el referido pagaré sin tener ante sí dicho pagaré y sin haber hecho ninguna anotación ni a ése ni a ningún otro. Dicho pagaré de $3,712,500 por el contrario habíase cancelado, según ya dijimos, ante el Notario Lavastida y el pagaré sustituto se había endosado a Barnett Mortgage Trust quien era entonces su tenedor.

Esta conducta que resalta en el caso de Castro, que otorgó cincuenticuatro escrituras, presenta un caso de abierto y repetido menosprecio a la verdad y al honor dignificante que como corolario de la profesión del abogado representa ostentar la fe pública notarial. *In re Ardín,* 75 D.P.R. 496 (1953). Al respecto se pronuncia un distinguido comentarista notarial: "El acto jurídico, autorizado con la fe pública, se tiene por auténtico, palabra derivada de una voz griega que significa lo cierto, lo verdadero, lo que ha de ser creído, lo que es fidedigno, y, por tanto, se afirma su certeza como si se estuviere presente al dictar la ley, el precepto o la sentencia, o al celebrar el acto o el contrato." T. González Palomino, *Instituciones de Derecho Notarial,* Madrid, 1948, Tomo 9, pág. 62. Es por eso imposible permitir que se burle impunemente la particular obligación de ser veraz que pesa sobre todo abogado cuando ejerce el notariado. La fundamental utilidad social y económica que tiene en nuestro ordenamiento el instrumento público, quedaría herida de muerte; la confianza que cifran las personas en la integridad del abogado, se vería desvanecer. Ver *Sucn. Santos* v. *Registrador,* 108 D.P.R. 831 (1979). Años ha que sustentamos ese criterio.

En el pasado este Tribunal ha encarado situaciones en las que ha considerado que ciertas faltas incurridas en el ejercicio de la notaría merecen la suspensión del ejercicio de la abogacía.

En *In re Ardín,* el allí querellado dio fe de que ciertas personas suscribieron y juraron ante él tres pagarés sin que real y efectivamente hubiera tenido ante sí a los firmantes. Suspendimos allí al notario del ejercicio de la profesión de

abogado por ser dicha actuación destructora de la fe notarial. Reafirmamos ese sano criterio en *In re Piñero*, 77 D.P.R. 630 (1954). Ver además, *In re Bosch*, 65 D.P.R. 248 (1945). Hoy queda sin efecto *sub silentio* la norma adoptada en los casos citados en el sentido de que la dación falsa de fe en un acto notarial conlleva la suspensión del ejercicio de la abogacía.

## V

A tenor con los fundamentos expuestos y atenuada la responsabilidad de los querellados por el solo hecho de no haber actuado con el propósito de defraudar, *In re Ardín*, supra, y considerando la proporcionalidad de las faltas incurridas, suspendería a los querellados del ejercicio de la abogacía durante determinados períodos en proporción a la gravedad de sus actuaciones. Sin embargo, habiendo el Tribunal por voz de tres de sus jueces impuesto sanciones a los querellados con las que no estoy conforme, no estimo necesario exponer mi criterio sobre sanciones más fuertes. Y aunque pudiera entenderse que al favorecer un mayor castigo debía estar de acuerdo con el menor, deseo reiterar que mi conciencia no permite la injusticia de condenar a uno solo de los abogados querellados a la separación de la profesión de la abogacía por actuaciones graves en las que están involucrados todos los querellados en circunstancias que ameritan la separación de todos.(3) Véase Código de Ética Profesional, Preámbulo, Criterios generales con relación a los deberes del abogado con sus clientes y del abogado para con la sociedad, y Cánones 18, 19, 21, 26, 35 y 38. 99 D.P.R. 1002 *et seq.*

---

(3)Los problemas relacionados con First Conventional por motivo de los gravámenes que nunca fueron liberados con respecto a las propiedades aquí involucradas fueron prominentemente discutidos en la prensa del país, y llegaron al punto de generar investigaciones de la Oficina del Fiscal Federal para Puerto Rico, del Departamento de Asuntos del Consumidor y de la Asamblea Legislativa de Puerto Rico.

—O—

Opinión disidente del Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 16 de julio de 1979

Este caso de conducta profesional se ha decidido con la participación de sólo cinco jueces del Tribunal y votación de tres a dos prevaleciendo una frágil mayoría de uno. Me insta a expresar mi disenso la desproporción en las sanciones impuestas, que se da no sólo entre el castigo y la falta, sino en los grados de responsabilidad profesional exigidos a unos y otros querellados; y no menos desapruebo el uso como sanción de la "suspensión indefinida" que en efecto pospone la decisión sobre la duración del castigo sin punto de referencia, que en la indefinición podría ser el momento en que el propio querellado estime que es acreedor a ser restituido al notariado.

Los cargos de conducta profesional impropia en esencia imputan a los querellados, que con mayor o menor ingerencia en las normas de la sociedad profesional Blanco Lugo, Morán y Lavastida, y aun otros sin facultad para alterar esas normas, intervinieron en la labor de notaría que instrumentó las operaciones crediticias y de venta de casas de First Conventional, sin preocuparse por el estado de cargas de los inmuebles que se vendían como afectos únicamente a la hipoteca en garantía de precio aplazado en favor de la corporación vendedora; haber utilizado fórmulas y cláusulas escriturarias que facilitaron el fraude por dicha corporación; conocidas las prácticas irregulares de su cliente omitiendo la liberación de las casas y vendiendo las hipotecas como si fueran "primeras", no poner sobre aviso a compradores y a los bancos; y violación del Canon 35 de Ética por permitir que su cliente First Conventional, cobrara por ellos los honorarios por servicios notariales.

Los abogados querellados tenían como cliente a la First Conventional Investment Corp., una firma dedicada al desarrollo y venta de viviendas. Lavastida, como miembro del

bufete, tenía a su cargo la dirección de las operaciones notariales relacionadas con dicha corporación, y Morán Loubriel, también socio, tenía una voz en esos trabajos. Castro Cros no formaba parte de la firma Blanco Lugo, Lavastida y Morán, y obtuvo el trabajo notarial de Coamo Gardens por voluntad del vendedor de los terrenos, pero venía obligado a ajustar el texto de sus escrituras y la tramitación de las mismas, como así lo hizo, a las directrices e información suplida por el bufete y sociedad profesional antes mencionada. Caparrós Cabrera y Castro Cros fueron los notarios ante quienes se otorgaron numerosas escrituras de segregación, compraventa e hipoteca mediante las cuales se vendían las casas. Colón Ramery tuvo una modesta participación en esta labor notarial. Dichos otorgamientos seguían un invariable orden de rutina y automatismo dictado por los formularios aprobados por la sociedad, al punto que uno de los notarios por un tiempo autorizó documentos que no reflejaban el nuevo estado de cargas de la finca principal. Titulaban como "primera hipoteca" las escrituras de hipoteca en garantía del precio aplazado por el comprador, como así debía quedar limitado el estado de cargas al liberar la First Conventional Investment Corp. los solares del crédito hipotecario principal a que estaba afecto el inmueble desarrollado. La financiadora First Conventional, sin embargo, descontaba esas "primeras hipotecas" en el Banco acumulándolas en proceso conocido como almacenamiento (*warehousing*) y desviando el dinero obtenido hacia otros fines. La deshonestidad de la financiera resultó en perjuicio de los compradores de casas que tenían sus viviendas gravadas con una hipoteca de $4,416,720.00; y de los bancos, que en vez de primeras hipotecas también encontraron su acreencia supeditada a la cuantiosa obligación original.

. Hemos examinado las conclusiones del Comisionado, Señor Abner Limardo, las objeciones a las mismas, y la prueba presentada, en parte extensísima mediante estipulaciones convenidas por el Procurador General y los querellados, y

encontramos que si bien el método o práctica notarial de los querellados hizo posible la defraudación por parte de First Conventional, no aparece que se diseñara con tal propósito por los abogados de la sociedad. El fraude fue de exclusiva hechura de la corporación financiera y de sus frutos fue ella la única beneficiaria.

No era obligación de los notarios querellados, una vez autorizada cada escritura de segregación y compraventa, fiscalizar en seguimiento los actos de la corporación First Conventional para cerciorarse de que honraba su obligación de liberar los solares. Su falta consistió en extender por más tiempo que el aconsejable por el hombre prudente, la confianza en la buena fe de la financiadora, en la lealtad en el tratar y el suponer "un conducirse como cabe esperar de cuantos, con pensamiento honrado, intervienen en el tráfico como contra-tantes."[1]

Con frecuencia el notario no dispone de tiempo y medios para iniciar una pesquisa de comprobación de lo que le informan los otorgantes respecto a gravámenes del inmueble. Hay operaciones de urgencia en que el notario cumple su cometido llamando la atención o exigiendo una ratificación por las partes del estado de cargas y depende de sus aseveraciones. No debe imponerse al notario una obligación absoluta de hacer un previo estudio de títulos en todo caso de documentos sujetos a Registro, porque ello iría en detrimento de la celeridad en los negocios y añadiría considerable costo a los servicios del notario. El estudio de títulos por iniciativa del notario debe ser la excepción, y no la regla. En la generalidad de los casos bastará a su ministerio advertir a los otorgantes sobre la conveniencia de esa investigación, y si advertidos e ilustrados cabalmente, pasan por alto la pesquisa, puede el notario proceder sin más al otorgamiento del documento. Lo contrario sería detener la contratación, de por sí ágil y hasta instantánea en nuestros días, mientras el notario y las partes

---

[1]Diez-Picazo, *La Doctrina de los Propios Actos*, edición 1963, pág. 157.

esperan por un informe de título que en la generalidad de los casos corroborará lo ya informado por los otorgantes pues el fraude entre partes que pactan todos los detalles de su negocio antes de acudir a la notaría, es rara ocurrencia. La exigencia al notario de previo estudio de títulos, resulta pues, rémora a la práctica notarial, obstáculo para el comercio y la libre contratación y penalidad para el pueblo.

Los querellados Caparrós Cabrera, Castro Cros y Colón Ramery tuvieron una participación pasiva en las operaciones documentales que han dado lugar a este procedimiento. Ninguno intervino por iniciativa propia en los diseños o planes que le permitieron a First Conventional defraudar a los compradores de viviendas y a los bancos. Su falta consistió en haber aceptado como bueno el modelo de escritura que el bufete les impuso. Del propio Castro Cros, único que no era miembro del bufete, dice el Comisionado Señor Abner Limardo que era parte de la "operación combinada y simultánea en que participaron los notarios del Bufete" (Informe, pág. 40); que para el proyecto Jardines de Coamo si bien Castro Cros preparó la forma o modelo de las escrituras de segregación, liberación y compraventa, la remitió a Lavastida "con gran antelación a la fecha en que se iniciarían los otorgamientos; y que a pesar de que el modelo preparado contenía incorrecciones relativas al gravamen hipotecario . . . así como la persona que aparecía como tenedora del pagaré hipotecario . . . no se advirtió por Lavastida o por ningún otro miembro del Bufete a Castro de esa situación." (Informe, pág. 20.)

Caparrós, Castro Cros y Colón fueron víctimas de los manejos de First Conventional Investment Corp. En el curso normal de los negocios ellos depositaron su confianza en esta corporación y de buena fe creyeron que usaría el dinero obtenido de los bancos, para liberar los solares vendidos. El fraude por First Conventional, y no los formularios o modelos de escrituras por ellos seguidos, fue la causa de su triste predicamento. En la evaluación de su conducta profesional es fundamental la percepción de relación periférica con las

irregularidades de First Conventional, que nace de su buena fe y que se circunscribe a su adhesión a una rutina escrituraria.

Ninguno de estos tres querellados se desvió de su diáfano historial. A la pág. 44 de su informe el Señor Comisionado describe a Colón Ramery como "abogado notario que goza de buena reputación personal y profesional"; a Caparrós Cabrera como "abogado laborioso y muy responsable . . . que ha demostrado tener gran calidad humana"; y a Castro Cros le dedica el párrafo final de su Informe, pág. 44 que transcribimos: "Castro goza de la más alta solvencia moral y una excelente reputación social. De estudiante fue moralmente ejemplar; es abogado respetuoso, cortés, dedicado y laborioso. Se ha destacado por su honradez e integridad. Durante los últimos seis años ha sido profesor de la Facultad de Administración de Empresas del Colegio Regional de Ponce de la Universidad de Puerto Rico; es miembro de la Junta de Disciplina de ese Colegio."

Un examen acucioso del informe sometido por el Procurador General y de los numerosos *exhibits* en que se apoya dejan claro que siguiendo el orden de distribución de trabajo en el bufete, el querellado Morán Loubriel no intervino en la preparación y autorización de documentos notariales para First Conventional en los casos de Coamo Gardens y Moca Gardens; que era el socio Lavastida quien tenía a su cargo la supervisión de todo el trabajo notarial para dicha financiera; y que el querellado, enterado de la conducta irregular de dicha cliente desde julio de 1973 adoptó una actitud pasiva e indiferente.

No hay indicio en el expediente de que el esquema financiero de First Conventional fuese producto del consejo o asesoramiento del querellado Morán Loubriel. La solidaridad entre los miembros de una sociedad profesional de abogados no sujeta un socio a ser disciplinado por la falta de ética de otro. La responsabilidad ética del abogado concierne a su exclusiva y personal conducta. El honor del abogado ni se fragmenta ni se enajena.

Pero no está el cristal del todo transparente. Una vez enterado de que el bufete del cual era socio podría aparecer en alguna forma vinculado a las dudosas actuaciones de First Conventional, debió este querellado utilizar su autoridad y su poder de socio para exigir una depuración sin demora de la situación. No encontramos, sin embargo, en el sumario elementos de connivencia o torpeza moral y sí más bien la rendición o abdicación de su criterio, descansando en el buen juicio e integridad de los socios a quienes especialmente concernía un área de trabajo legal en la que él no intervenía. Su despreocupación y desidia lo han llevado a un paso del peor desenlace en la vida del abogado y al sufrimiento moral que conlleva la simple presentación de una querella de desaforo.

Cuando la conducta del abogado no acusa corrupción o inmoralidad que haga ineludible su separación del ejercicio de la profesión por tiempo determinado, la duración del castigo, el término de separación, es elemento secundario en la sanción disciplinaria. El desaforo o la censura, cuando lo sufren hombres de honor, logran su valor de correctivo con sólo pronunciarlos. En nada aumenta el peso de la sanción y su objetivo de reivindicación ética, su prolongación en el tiempo.

Hubiese limitado las medidas disciplinarias al ejercicio del notariado, con suspensiones *precisas* de un año al señor Lavastida; seis meses a los señores Caparrós Cabrera y Castro Cros; y censura a los señores Morán Loubriel y Colón Ramery.

—O—

Opinión del Juez Asociado Señor Irizarry Yunqué, a la cual se une el Juez Asociado Señor Torres Rigual.

San Juan, Puerto Rico, a 16 de julio de 1979

El Procurador General formuló querellas por violación a la Ley Notarial y al Código de Ética Profesional contra los abogados notarios José A. Lavastida, Ramón Morán Loubriel, Luis E. Colón Ramery, Víctor M. Caparrós Cabrera y Athos

Castro Cros. Los cargos emanan del otorgamiento de escrituras de segregación, compraventa, liberación y constitución de hipoteca sobre solares en proyectos de urbanizaciones financiados a través de la First Conventional Investment Corporation (en adelante F.C.I.C.). Sometidas ante este Tribunal las querellas y sus contestaciones, y nombrado un Comisionado Especial, éste determinó que los querellados habían incurrido en la conducta imputádales.

Luego de examinar las pruebas presentadas, los comentarios y las objeciones de los querellados al informe del Comisionado, entendemos que los querellados incurrieron en la conducta que pasamos a exponer.

La firma de abogados Blanco Lugo, Morán y Lavastida, a la que en adelante nos referiremos como el Bufete, quedó organizada en el año 1971, integrada por los abogados Luis Blanco Lugo, Ramón Morán Loubriel y José A. Lavastida.[1] Ese mismo año ingresaron al Bufete los abogados Víctor M. Caparrós Cabrera y Luis E. Colón Ramery, el primero como abogado asociado a base de un sueldo y un beneficio adicional anual, y el segundo como empleado.

Todos los asuntos legales de la F.C.I.C. y sus subsidiarias eran atendidos por el Bufete. Aquélla inició sus actividades en Puerto Rico en el año 1965, dedicándose principalmente al negocio de corretaje en el financiamiento de proyectos de viviendas e hipotecas. Entre sus negocios figuró la adquisición de terrenos para ulterior desarrollo urbanístico por mediación de otras corporaciones subsidiarias. Sus directores y oficiales eran José García Pino, presidente; Adrián Vidal, vice presidente; Eduardo Morales y Constantino Argimón, directores.

Además de F.C.I.C. y sus subsidiarias, el Bufete contaba con una clientela de gran importancia económica, entre ella

[1]El Bufete tuvo su origen en la oficina de abogados González, Jr., González Oliver y Novack. Al separarse de ella el Lic. Novack, ingresó como socio el Lic. Morán en 1966, denominándose González, Jr., González Oliver y Morán. Luego se unió a ella el Lic. Blanco Lugo y vino a llamarse González, Jr., González Oliver, Blanco Lugo y Morán. Al ocurrir una separación de los socios, se formó en 1971 el Bufete Blanco Lugo, Morán y Lavastida.

Trust Mortgage Corporation, el Banco Crédito y Ahorro Ponceño y el Banco de Economías.

La labor en el Bufete se hallaba repartida entre sus miembros a base de áreas de trabajo, importancia de los asuntos, y clientela, aunque estas divisiones eran flexibles. Lavastida atendía la documentación notarial de mayor jerarquía, asignaba y distribuía entre los abogados del Bufete el trabajo notarial de menor jerarquía de casi todos los clientes, y realizaba una labor coordinadora entre los que hacían labor notarial para la F.C.I.C. La preparación de los documentos estaba a cargo del notario que hacía el proyecto, pero los notarios del Bufete consultaban frecuentemente a Lavastida. Las escrituras no se cotejaban por Lavastida. Sin embargo, cuando se comenzaba un proyecto los notarios ante los cuales se iban a otorgar los documentos discutían con él la forma en que se iba a trabajar con el otorgamiento, los días para éste, el lugar, la forma de continuar la preparación de las escrituras en la oficina, etc. También podían consultar estos pormenores con el Lic. Meléndez Pérez, otro de los socios.

Los notarios del Bufete tenían instrucciones de solicitar estudios registrales para la preparación de escrituras individuales. No se celebraban reuniones generales para la orientación de todos los notarios. Sí se llevaban a cabo reuniones informales y espontáneas entre algunos de los abogados.

El área de trabajo de Morán en el Bufete era la contributiva. Él no estaba encargado de supervisar la notaría, ni tenía conocimiento de las operaciones de la F.C.I.C. Su intervención en la notaría relacionada con la F.C.I.C. fue incidental, limitada al otorgamiento de dos escrituras en 1970 y dos en 1973, las cuales no fueron objeto de irregularidad alguna.

El resto del trabajo notarial del Bufete estaba a cargo de Caparrós, Colón y el Lic. Andrés Cuevas. La notaría y el trabajo legal, ambos de menor jerarquía, concernientes a las viviendas financiadas por el Banco Crédito y Ahorro Ponceño estaban a cargo de Colón. Caparrós hacía trabajo legal en

general, y tenía a su cargo la preparación de los documentos y escrituras relacionadas con los cierres de proyectos de viviendas, en particular las escrituras de F.C.I.C. y sus subsidiarias, si aquéllas eran de menor jerarquía.

Réstanos señalar como elemento de operación en el Bufete, que éste facturaba a F.C.I.C., directamente, por el trabajo notarial que para ella realizaba.

El 2 de noviembre de 1970, F.C.I.C. compró a don Ramón Luis Carro Umpierre y su esposa, por precio de $225,000, una finca de 30.70 cuerdas en el municipio de Coamo. En esa misma fecha, mediante la escritura número 48 otorgada en San Juan ante Morán Loubriel, F.C.I.C. vendió dicha finca a Coamo Gardens Development Corporation por $345,000, de cuya cantidad recibió $300,000, quedando el balance de $45,000 aplazado para pagarse en dos años. Dicha suma de $45,000 quedó representada por un pagaré garantizado con hipoteca que fue debidamente inscrita en el Registro de la Propiedad el 14 de enero de 1971.

El mismo día 2 de noviembre de 1970 Coamo Gardens concertó con F.C.I.C. un contrato de préstamo a los fines de tramitar, a través de F.C.I.C., el financiamiento de un proyecto de viviendas a desarrollarse en la finca, bajo el nombre de Jardines de Coamo. Con tal propósito, otorgó un pagaré a la orden de F.C.I.C. por $3,712,500 más intereses al 10% anual, vencedero el 2 de mayo de 1972. En garantía de dicho pagaré se constituyó hipoteca mediante la escritura número 49 de 2 de noviembre de 1970, otorgada ante Morán Loubriel. Se dispuso en la escritura que la hipoteca en garantía del pagaré de $45,000 constituida mediante la escritura número 48 quedaba postergada para que la constituida en garantía de los $3,712,500 tuviera rango de primera. Se estipuló, además, que el producto del pagaré por $3,712,500 se destinaría a financiar el proyecto de Coamo Gardens con sujeción a los términos y condiciones del préstamo de construcción (*Construction Loan Agreement*) convenido, que se incorporó y fue hecho parte de la escritura de hipoteca.

First Conventional (F.C.I.C.) sería la intermediaria en la obtención de fondos para el proyecto. En la misma fecha—2 de noviembre—F.C.I.C. endosó el pagaré por $3,712,500 a favor de Atico Mortgage Investors, que proveería los fondos para el financiamiento interino de dicho proyecto mediante pagos a base de certificaciones periódicas conforme al progreso y desarrollo del proyecto.

Así las cosas, el 10 de noviembre de 1970 Coamo Gardens otorgó ante el notario Francisco González, Jr., la escritura número 371 en que constituyó sobre la misma finca otra hipoteca en garantía de un pagaré al portador por $7,125.00. Y el 3 de agosto de 1972, por escritura número 43 ante el notario Ernesto Meléndez Pérez, Coamo Gardens constituyó otra hipoteca sobre el inmueble para garantizar un pagaré al portador por $100,000. Esta escritura fue presentada para inscripción el 4 de agosto de 1972, siendo inscrita el 17 de enero de 1973.

Posteriormente Coamo Gardens obtuvo de Barnett Mortgage Trust, del estado de Florida, un refinanciamiento del proyecto, adquiriendo Barnett Mortgage el crédito de Atico Mortgage. En el trámite para esta operación intervino F.C.I.C., y se hizo a través del Bufete. Con ese propósito, el 22 de agosto de 1972 Coamo Gardens suscribió ante Lavastida un pagaré al portador por $4,416,720, e intereses al 12% anual, vencedero el 22 de febrero de 1974. Dicho pagaré sustituyó el de $3,712,500, habiéndose indicado en su faz que continuaría garantizado por la hipoteca número 49 otorgada ante Morán el 2 de noviembre de 1970. Lavastida procedió a cancelar e invalidar el pagaré de $3,712,500 e hizo constar en el mismo, bajo su sello notarial, que ya no estaba en efecto y que era sustituido por otro de $4,416,720. El pagaré de $3,712,500 fue endosado por el representante de Atico Mortgage a favor de First Conventional, y retenido bajo su custodia por Lavastida.

El pagaré por $4,416,720 fue endosado por el representante de F.C.I.C. a favor de Barnett Mortgage el mismo día 22 de

agosto y entregado a dicha firma, que en adelante desembolsó los fondos para el financiamiento del proyecto de Coamo Gardens mediante certificaciones periódicas del progreso de las obras.

El trámite del refinanciamiento quedó escriturado ante Lavastida mediante escritura de su protocolo número 229, otorgada el 22 de agosto de 1972, sobre Modificación de Hipoteca y Sustitución de Pagaré. En la misma se modificó la hipoteca constituida por la escritura número 49 otorgada ante Morán el 2 de noviembre de 1970, aumentándose el principal garantizado a la cantidad de $4,416,720.00, importe del pagaré de esa suma, aumentando el tipo de interés al 12%, y extendiendo el vencimiento hasta el 22 de febrero de 1974. Se hizo constar además la sustitución del pagaré de $3,712,500 por el de $4,416,720. La escritura 229 fue presentada para inscripción el 29 de agosto de 1972 e inscrita el 2 de febrero de 1973, como inscripción sexta.

La escritura 371 en garantía del pagaré por $7,125 fue presentada el 29 e agosto de 1972 e inscrita el 6 de febrero de 1973 como inscripción séptima.

Por escrituras número 232 y 230 otorgadas el 22 de agosto de 1972 ante Lavastida, las hipotecas en garantía de las sumas de $45,000 y $100,000 quedaron postergadas entre si y en relación con la ampliada en garantía del pagaré por $4,416,720. Así, el cuadro registral de gravámenes hipotecarios sobre la finca de Coamo Gardens, inmatriculada con el número 3101, era el siguiente para el 6 de febrero de 1973: primera hipoteca, la que garantizaba los $4,416,720; segunda, en garantía de $100,000; tercera hipoteca, la referente a los $45,000; y en cuarto rango la hipoteca de $7,125.

La venta al público de los solares de Jardines de Coamo se hacía mediante dos operaciones escriturales. Mediante la primera se segregaba el solar particular de la finca principal, se liberaba del gravamen que la afectaba, y se llevaba a cabo la compraventa. Mediante la segunda, cada adquirente de

solar segregado constituía una primera hipoteca sobre su propiedad, en garantía del precio aplazado.

El Lic. Castro Cros, quien nunca ha sido miembro del Bufete, preparó el formato de las escrituras de segregación, liberación y compraventa para mediados de 1972 con la información que le suministrara el Presidente de Coamo Gardens. Como señalamos anteriormente, ya para el 6 de febrero de 1973 constaban inscritos, con sus rangos correspondientes, los gravámenes que afectaban la finca principal en Coamo, y la escritura en la cual se constituía el gravamen preferente de $4,416,720 estaba presentada en el Registro desde el 29 de agosto de 1972. Castro Cros no realizó estudio registral alguno de la finca principal, ni investigó las cargas que afectaban el inmueble. Como consecuencia, en las escrituras por él preparadas apareció la finca principal afecta a una hipoteca por $3,712,500. No se hizo mención de otro gravamen.

El Bufete estaba a cargo de la preparación de las escrituras de primeras hipotecas individuales del proyecto de Coamo. Castro Cros le envió a Lavastida copia de las escrituras por él preparadas. No obstante conocer Lavastida la verdadera situación registral, ni él ni miembro alguno del Bufete objetó ni tomó acción para corregir el error que en cuanto a gravámenes hipotecarios afectaba a esas escrituras.

El 5 de abril de 1973 comenzó la venta al público de los solares del proyecto. Desde esa fecha hasta el 16 de julio de 1973 Castro Cros autorizó 39 escrituras de segregación, liberación y compraventa en las que aparecía la finca principal afecta a una sola hipoteca, la de $3,712,500. En ellas comparecía Coamo Gardens como vendedora; el comprador particular del lote segregado; y F.C.I.C., a través de García Pino, liberando los respectivos lotes segregados de la hipoteca de $3,712,500 en calidad de tenedora del pagaré por esa misma suma.

Caparrós también autorizó una de esas escrituras como miembro del Bufete. Ésta adolecía de los mismos errores que

aquellas otorgadas ante Castro Cros. Caparrós admitió que en ese otorgamiento nunca se le mostró el pagaré por $3,712,500 del cual supuestamente era tenedora la F.C.I.C. En la escritura dio fe de lo contrario.

Castro Cros estipuló que surge de las escrituras otorgadas ante él que tuvo ante sí un pagaré por $3,712,500 e hizo en él las correspondientes notas de cancelación. Esto es dudoso, pues dicho pagaré estaba en poder de Lavastida, y había sido sustituido por el de $4,416,720. Por otro lado, si lo tuvo ante sí debió ver de su faz que estaba cancelado y sustituido por el de $4,416,720, y que era falso lo consignado en dichas escrituras. Meses después de estos primeros otorgamientos, Castro Cros autorizó otras escrituras de segregación, liberación y compraventa de Jardines de Coamo, en las que hizo referencia a la existencia de un gravamen hipotecario preferente de $4,416,720. En ellas comparecía F.C.I.C., realizando las liberaciones correspondientes como tenedora del mismo sin serlo. Dio fe de que tuvo ante sí el pagaré y que hizo en él las correspondientes notas de cancelación. Se estipuló que así surgía de dichas escrituras.

Caparrós y Colón Ramery, miembros del Bufete, autorizaron varias de las escrituras de primera hipoteca sobre los lotes vendidos en Jardines de Coamo. Estos otorgamientos fueron posteriores a la fecha en que aparece constancia en el Registro de los gravámenes que afectaban la finca principal.([2]) Ninguno de los dos notarios conocía el estado registral de la finca. Ninguno había hecho gestión previa al otorgamiento de las escrituras para conocer la situación registral de la finca principal de Jardines de Coamo. Los notarios que autorizaron esas escrituras de primeras hipotecas no conocían el contenido

---

([2])Los otorgamientos ante Colón Ramery ocurrieron el 1ro, 8 y 29 de junio de 1973. No surge de la prueba la fecha exacta de las otorgadas ante Caparrós. Según consta de su protocolo fue en el 1973. No pudieron haber sido antes de abril de 1973, pues las primeras escrituras de segregación, compraventa y liberación se otorgaron el 5 de abril de 1973. Las escrituras de primera hipoteca no pudieron ser otorgadas antes de esa fecha. En párrafos anteriores reseñamos el estado registral correcto de la finca principal para el 6 de febrero de 1973.

de las escrituras de segregación, compraventa y liberación, preparadas por Castro Cros. En estos otorgamientos la F.C.I.C. no les presentó el pagaré pertinente,(3) y confiaron en la palabra de F.C.I.C. de que era su tenedora.

En las discutidas escrituras de hipoteca comparecían los compradores de los respectivos lotes particulares adquiridos a través de las escrituras de segregación, liberación y compraventa autorizadas por Castro. Mediante la escritura constituían hipoteca sobre la propiedad recién adquirida. El rango de la hipoteca así constituida era el de primera, y garantizaba el pagaré que por el precio restante otorgaron los compradores a favor de F.C.I.C.

Colón Ramery tuvo conocimiento de la existencia de los tres gravámenes inferiores que afectaban la finca principal en Coamo, y que habían sido omitidos de las escrituras otorgadas en esa urbanización, el 17 de septiembre de 1973 en virtud de una carta cursádale por el Registrador. Nada indica que conociera de la existencia del gravamen preferente de $4,416,720 antes de febrero de 1974. Castro Cros supo de la existencia de los gravámenes inferiores y del de $4,416,720 desde esa misma fecha 17 de septiembre de 1973, pero ignoraba que la F.C.I.C. hubiera negociado el pagaré de $4,416,720. Esto lo vino a saber después de enero de 1974. Según la prueba estipulada por Caparrós y el Procurador General, no fue hasta febrero de 1974 que él supo de la modificación del gravamen de $3,712,500 y del error al respecto en las escrituras de Coamo. Sin embargo, él conocía de la existencia de los otros tres gravámenes inferiores desde septiembre de 1973.

Es obvio que los cierres comenzaron sin que el pagaré de $4,416,720 estuviera en Puerto Rico. Lavastida había escrito a Barnett gestionando el envío del pagaré, para así iniciar los cierres, el 24 de abril de 1973. Ya para esa fecha los cierres habían comenzado. El pagaré llegó tarde, en el verano de

---

(3)El de $3,712,500 era el que se relacionaba en las escrituras.

1973. No fue hasta agosto 8 de 1973 que Lavastida entregó el original del pagaré al depositario designado por su tenedor, E. Dardett, de la Home Title Agency, para que representara al tenedor del mismo en las ventas del proyecto de Coamo. Por estas razones resalta además que la F.C.I.C. no era la tenedora de dicho pagaré.

En resumen, en los otorgamientos de Jardines de Coamo, existen las siguientes irregularidades: (1) información errónea sobre los gravámenes hipotecarios que afectaban la finca principal, no sólo en cuanto al rango y la cantidad de dinero garantizado sino también en cuanto al número de gravámenes; (2) dación de fe de que el tenedor del pagaré garantizado por el gravamen preferente presentó dicho pagaré al notario autorizante y de que el mismo fue cancelado, cuando ello era imposible porque quien comparecía como tenedor (F.C.I.C.) no tenía el pagaré pertinente;[4] y (3) constitución de hipotecas con rango de primeras cuando en realidad éste no era el rango que gozaban por existir otras anteriores sin liberar.

El Bufete también participó en los otorgamientos de los proyectos de Jardines de Villa del Carmen y Moca Gardens en Cidra y Moca, respectivamente. Éstos fueron desarrollados y financiados a través de F.C.I.C. y sus subsidiarias Moca Gardens Development Corporation y Equity Construction Corporation. Los lotes individuales en Jardines de Villa del Carmen fueron vendidos a través de Equity Construction Corp. y los de la urbanización en Moca, a través de Moca Gardens.

Caparrós fue el notario autorizante en varios otorgamientos en ambas urbanizaciones. En los correspondientes a Jardines de Villa del Carmen, titulados de segregación, liberación y compraventa, comparecieron Equity Construction como vendedora, los compradores particulares de cada lote; y

---

[4]Lavastida había guardado el pagaré de $3,712,500 desde su cancelación. El tenedor del pagaré de $4,416,720 era Barnett Mortgage quien lo envió a Puerto Rico y designó como depositario a E. Dardett, de Home Title Agency, como habíamos apuntado anteriormente.

Home Title Agency y el Banco de Economías y Préstamos para efectuar las liberaciones de los gravámenes hipotecarios de la finca principal. Luego de tomar las firmas de los compradores y vendedores, Caparrós se trasladaba a las oficinas de los acreedores para allí obtener sus firmas. Al así proceder se confrontó con el problema de que ambos acreedores se negaron a firmar las liberaciones porque F.C.I.C. no les había satisfecho el precio de liberación. Esta situación se intentó resolver por los miembros del Bufete a cargo de los asuntos de la F.C.I.C., sin éxito.

Al no lograrse el pago y las consecuentes liberaciones, Caparrós añadió a las escrituras por él autorizadas que adolecían de la falta de firma de los acreedores, una nota final de su puño y letra, en el espacio que sigue al de la firma de la vendedora y compradores. Después de esa nota firmó, selló y rubricó las escrituras para completar los otorgamientos. No avisó de la adición a los compradores, ni se requirió su comparecencia o aprobación. El resultado fue que quedaron otorgadas las escrituras sin efectuarse las liberaciones que en ellas constaban. El contenido de la nota era el siguiente:

"Doy fe de que en la fecha de su otorgamiento, luego de firmar ante mí las personas cuyas firmas anteceden, requerí de Home Title Agency of Puerto Rico, Inc. y del Banco de Economías y Préstamos, las respectivas firmas en esta escritura a los fines de las liberaciones a que esta escritura se refiere, manifestándoseme que las mismas no podían ser efectuadas por no habérseles pagado las sumas pactadas para dichas liberaciones. En vista de ello, extiendo esta diligencia para que quede constancia a todos los efectos legales procedentes de que la comparecencia de Home Title Agency of Puerto Rico, Inc. y del Banco de Economías y Préstamos se deben entender por no puestas en esta escritura."

La negativa de los acreedores a consentir a las liberaciones de los gravámenes hipotecarios en los otorgamientos de Jardines de Villa del Carmen y otros problemas análogos en otro proyecto desarrollado y financiado por F.C.I.C. provocó que los socios del Bufete decidieran llevar a cabo un cambio en el formato de las escrituras de los proyectos de la F.C.I.C.

que se autorizacen de allí en adelante. El cambio consistió en que la segregación y la compraventa se llevarían a cabo como acto separado de la liberación. Ésta se llevaría a cabo mediante escritura separada. En la escritura de segregación y compraventa se eliminó toda referencia a la comparecencia de los acreedores hipotecarios y a la liberación que de los gravámenes que afectaban a las propiedades tenía que hacer. No se hizo comparecer a F.C.I.C. en las escrituras de segregación y compraventa. No obstante, se añadió un párrafo noveno en el que constaba lo siguiente:

"First Conventional Investment hace constar que los tenedores de los gravámenes relacionados en el párrafo Primero en la sección de Títulos y Cargas de esta escritura no comparecen a liberar de dichos gravámenes el solar segregado mediante este acto, por lo que el mismo permanece afecto a dichos gravámenes hasta que por documento público por separado se lleven a efecto las liberaciones, a lo cual se compromete First Conventional Investment Corp."

La evidencia presentada no responsabiliza directamente a Lavastida por el cambio en el formato de las escrituras. Sin embargo, dada su posición en el Bufete en lo que a la notaría y a los asuntos de la F.C.I.C. respecta, es inescapable la conclusión de que él jugó un papel principal en la determinación e instrumentación del uso del nuevo formato. En cuanto a Morán, la decisión de cambiar el formato no partió de él. Ésta le fue comunicada en julio o agosto de 1973, y su conocimiento de las razones para ello era uno general: se le informó que el propósito fue evitarle al notario el problema de tener que lograr el otorgamiento de la segregación, compraventa y liberación el mismo día. Nada hay en la prueba estipulada que establezca que Caparrós preparara los modelos de las escrituras para los nuevos otorgamientos en Cidra y en Moca.

Tanto Colón Ramery como Caparrós autorizaron escrituras que contenían el nuevo formato adoptado por el Bufete. Colón fue el notario autorizante en Moca; Caparrós en Villa del Carmen. Ambos hicieron advertencias a los compradores de Villa del Carmen y Moca Gardens en el sentido de que las

propiedades que adquirían no se estaban liberando en aquellos momentos. Algunos compradores, al ser enterados de esto, rehusaron firmar, pero muchos consumaron la transacción.

Ya desde mediados de 1973 Lavastida, Morán y los otros socios del Bufete estaban conscientes de que la F.C.I.C. tenía problemas económicos que impedían las liberaciones de los gravámenes hipotecarios en los lotes vendidos en Coamo, Moca y Cidra. Las liberaciones no se estaban efectuando porque la F.C.I.C. no pagaba las sumas necesarias para ello. A principios de 1974 aún no se había amortizado la deuda del financiamiento interino de la que era acreedora Barnett Mortgage. El vencimiento del pagaré de $4,416,720 era el 22 de febrero de 1974. Por lo menos Lavastida estaba al tanto de la suerte que corrían las liberaciones, porque el Bufete se encargaba de la presentación de las escrituras en el Registro y Lavastida ocupaba una posición preeminente en lo que a la notaría del Bufete se refiere. Obviamente, si las liberaciones no se lograban, las escrituras de primera hipoteca no se podían inscribir.

Como parte del trámite de los otorgamientos, el Bufete hacía entrega a F.C.I.C. de copias certificadas de las escrituras de presuntas primeras hipotecas y del pagaré suscrito por cada comprador para el financiamiento permanente, garantizado con dicha primera hipoteca. First Conventional entregó estos pagarés y las escrituras de las presuntas primeras hipotecas a diversas entidades bancarias a cambio de dinero. Estos fondos no fueron destinados a la liberación de los lotes vendidos. Lavastida sabía que no existían esas primeras hipotecas, pero nada hizo para impedir su entrega a F.C.I.C. y el consiguiente fraude.

La magnitud del problema no fue descubierto por los socios y el resto del Bufete hasta principios de 1974. Ya desde enero de 1974 Lavastida y Caparrós se habían percatado de que las liberaciones de hipotecas en casos de la F.C.I.C. seguían sin lograrse. Las circunstancias señaladas en el párrafo anterior provocaron el enfrentamiento del Bufete con

F.C.I.C. para resolver el problema de la falta de liberación y el vencimiento del gravamen hipotecario por $4,416,720. Como resultado, el 8 de febrero de 1974 la F.C.I.C. informó al Bufete, a través de Lavastida, que había entregado los pagarés y las escrituras de hipotecas que los garantizaban a diversas entidades bancarias a cambio de dinero y que había usado los fondos así obtenidos para otros fines, en vez de pagar así el precio de las liberaciones que se hallaban pendientes.

Como consecuencia, el 15 de febrero de 1974 los socios del Bufete renunciaron a la representación legal de la F.C.I.C. y sus subsidiarias. A la semana siguiente le informaron a los bancos defraudados la situación descubierta, mas en ningún momento le informaron a los compradores de lo acontecido. Éstos se enteraron posteriormente, a través de la prensa.

Examinemos las consecuencias de todas estas actuaciones con respecto a la responsabilidad profesional de cada uno de los querellados. Las adiciones hechas por Caparrós de su puño y letra al final de las escrituras constituyen una violación a la Ley Notarial, porque no fueron salvadas con la aprobación expresa de las partes y porque carecen de la firma de éstas. 4 L.P.R.A. sec. 1018.[5] Su adición constituye una actuación negligente por parte de un notario, que redundó en perjuicio de los compradores, porque entrañaba la permanencia de un gravamen de mayor rango que el constituido por los compradores sobre su propiedad. Debió haberles notificado que no se obtuvieron las correspondientes liberaciones, y obtener su firma y su consentimiento. Las adiciones resultan nulas. 4 L.P.R.A. sec. 1018.

La autorización de escrituras erróneas en cuanto a los gravámenes que afectan a la finca principal y el rango de éstos, la constitución de hipotecas con rango de primeras

---

[5]Ésta dispone:

"Serán nulas las adiciones, apostillas, entrerrenglonaduras, raspaduras y testados en las escrituras matrices, siempre que no se salven al fin de éstas, con aprobación expresa de las partes y firmas de los que deben suscribir el instrumento."

cuando éste era inexistente, el haber dado fe en diversas ocasiones de tener ante sí un pagaré y de que se procedía a hacer en el mismo la correspondiente anotación de liberación, cuando era imposible porque el pagaré estaba en poder de otro, y asimismo afirmar que su tenedor era F.C.I.C. cuando ese no era el caso, constituyen violaciones de la fe pública notarial y de los Cánones 35 y 38 del Código de Ética Profesional en las que incurrieron Castro Cros, Caparrós y Colón Ramery.

Un estudio registral oportuno hubiera evitado el error cometido por estos tres notarios en cuanto a los gravámenes de la finca principal en Coamo. Señalan los querellados, sin embargo, que un notario no tiene la obligación de hacer un estudio registral de la propiedad sobre la cual va a autorizar escrituras públicas a las cuales va a brindar su fe notarial. Según ellos, esa obligación sólo surge si es parte de la gestión profesional que le encomienda su cliente.

En *In re Meléndez Pérez*, 104 D.P.R. 770, 775 (1976), expresamos lo siguiente:

"Por tradición, y en nuestra patria además por expresión legislativa, el notario no es simple observador del negocio jurídico que ante él se realiza limitando su actuación a cerciorarse de la identidad de partes y autenticidad de las firmas. Su función, que no es privada, sino pública, trasciende la de un autómata legalizador de las firmas y penetra el campo de la legalidad de la transacción que ante él se concreta."

Un notario no puede cumplir a cabalidad su función pública, si autoriza escrituras en las que se mencionan y se constituyen gravámenes sin la certeza de que está en lo correcto en cuanto a su creación, existencia y rango.

En *Goenaga* v. *O'Neill de Milán*, 85 D.P.R. 170, 194 (1962), expresamos que ni los otorgantes ni el notario que autoriza el documento pueden ignorar el estado registral, a la fecha del otorgamiento, de la propiedad sobre la cual otorgan una escritura. Además, dispone el Canon 35 del Código de Ética Profesional que "... El abogado debe ajustarse a la sinceridad

de los hechos . . . al redactar afidávits [*sic*] u otros documentos. . . ."

No es suficiente, tampoco, basarse en la información suplida por las partes. No debe servir de excusa el que la fe notarial no cubre las declaraciones de los comparecientes. "Incumbe, en suma, al notario no sólo cuidar de la aplicación correcta de la ley, sino de velar por la realización, lo más plena que sea posible, de la justicia, haciendo que las convenciones y negocios sean expresión de la moral más rígida y del Derecho más justo, y evitando se deslice en ellos cualquier fraude de ley o cualquier abuso de Derecho." Castán, *Función Notarial y Elaboración Notarial del Derecho*, 1946, pág. 167. "La función notarial da forma; pero también hace algo más que eso: legitima relaciones jurídicas o, dicho en términos más llanos, da eficacia al contenido del instrumento público, tanto por la presunción de veracidad que de él emana, como por virtud del carácter técnico-jurídico que tiene la intervención del notario y que exige un proceso de calificación. . . ." Giménez-Arnau, *Derecho Notarial*, 1976, pág. 69. Señala dicho autor que la función notarial debe aspirar, entre otras cosas, a garantizar la legalidad o legitimidad del acto. *Id.* Un notario no puede cumplir a cabalidad su función si ignora elementos esenciales del objeto del acto que se legitima ante él, como lo sería la situación registral de una finca sobre la cual se otorga una escritura de hipoteca autorizada por él o sobre la cual existen gravámenes de los que se desea liberar la finca mediante escritura a tales fines. Correspondía a los notarios querellados cerciorarse de la corrección de lo expresado en las escrituras autorizadas por ellos en lo que atañe al estado registral de los inmuebles.

No estamos significando que el notario tiene en todos los casos una obligación absoluta de hacer un estudio de títulos como requisito previo al otorgamiento de escrituras que afectan bienes o derechos inscritos o inscribibles o de que deba tomarse razón en el Registro de la Propiedad.

Puede haber operaciones de urgencia en que la celeridad

del negocio impida el estudio registral previo. Reconocemos, además, que en cuanto no se violen los requisitos que por ley se establecen para la validez del otorgamiento de un instrumento notarial, el notario no puede ir más allá de lo que los otorgantes estén dispuestos a consentir. En uno u otro caso, sin embargo, el notario debe advertir cumplidamente a los otorgantes de la necesidad de la investigación registral y, si advertidos cabalmente, pasan por alto la pesquisa, puede proceder sin más al otorgamiento del instrumento haciendo constar, para mayor garantía, que tales advertencias han sido hechas.

Los otorgamientos que consideramos en los casos ante nos no presentaban las circunstancias de excepción señaladas. Tanto Castro Cros como los notarios del Bufete autorizaban escrituras en que un cliente de uno y otros comparecían: Coamo Gardens, cliente de Castro, para vender solares, y First Conventional, cliente del Bufete, para hacer liberaciones. Los otros otorgantes eran los numerosos compradores de los solares, personas que confiadamente pagaban un precio y firmaban como compradores creyendo en la veracidad y corrección de lo expuesto en las escrituras sobre títulos y cargas de lo que compraban. Si a los notarios les bastó, respecto a esta información, lo que sus clientes Coamo Gardens y First Conventional les informaron, sin hacer más advertencias a los compradores, facilitaron por su inacción, el engaño de que éstos eran víctimas.

El notario debe cuidarse de que la falsedad no tenga cabida en los instrumentos que ante él se otorgan. Debe recordar que aun en el estricto desempeño de una función notarial, es, ante todo, abogado, y que la abogacía es por excelencia profesión de legalidad.

En cuanto a las escrituras relacionadas con Moca y Cidra, se cometieron las siguientes irregularidades: la expresión de una obligación por parte de una entidad que no comparece en la escritura y el otorgamiento de hipotecas con rango de primeras, cuyo rango dependía de liberaciones que no se

celebraban simultáneamente. Constituyen omisiones que indican un proceder negligente por parte de Caparrós y de Colón Ramery como notarios autorizantes.

La comparecencia "es la parte de la escritura en la que se determina el acto que constituye su objeto y las personas entre quienes se celebra . . . ." "Mediante ella el sujeto, desde estar fuera, ingresa, para dentro del territorio del instrumento público." Giménez-Arnau, *Derecho Notarial,* 1976, pág. 519. La F.C.I.C. no compareció en las escrituras en que hacía constar en su párrafo noveno que ella se obligaba a lograr las liberaciones de los gravámenes que afectaban las fincas en Cidra y Moca. Dicha cláusula novena carece de eficacia alguna por constituir una obligación asumida por un extraño al otorgamiento. No hay duda que la inclusión de dicha cláusula constituía factor muy importante en la decisión de los compradores de cerrar el negocio.

Examinemos las consecuencias de la separación de la segregación y compraventa por un lado, y la liberación por otro. Las escrituras de compraventa y las de "primera" hipoteca sobre los solares segregados se otorgaban el mismo día. Al separar en el formato de la escritura, la compraventa de la liberación, se hizo posible que no se tuviera que obtener la liberación el mismo día que se otorgaba la compraventa o dentro de las próximas 24 horas. Se facilitó la constitución de hipotecas con rango de primeras que no necesariamente tenían tal rango. De tal forma se le ofreció a la F.C.I.C. la oportunidad de obviar la obtención de las liberaciones por no ser éstas apremiantes y dar en prenda a los bancos unos pagarés garantizados por hipotecas inexistentes.

Ni Lavastida ni Morán fueron los notarios autorizantes de las escrituras objeto de las irregularidades señaladas. Nada indica que Morán tuviera conocimiento de las irregularidades cometidas en los otorgamientos de Coamo antes de que la situación explotara a principios de 1974. Está libre de responsabilidad en cuanto a esto, mas no así Lavastida. Él era el coordinador del aspecto notarial en los cierres del proyecto

de Coamo. Forzosamente tenía conocimiento de la fecha en que comenzaron los cierres y de los términos en que estaban redactadas las escrituras. Además sabía que el gravamen de $3,712,500 había sido sustituido por el de $4,416,720 y que su tenedor no era la F.C.I.C. Nada hizo para corregir los errores que contenían estas escrituras y que por su posición en el Bufete tenía que conocer. Su conocimiento de las irregularidades que existían en los cierres en Coamo y su inacción y desidia en lo que a su corrección respecta, unidos a su posición en el Bufete, le hacen responsable.

Igual conclusión procede en cuanto a las irregularidades en las escrituras otorgadas en Moca y Cidra. Lavastida no fue el notario autorizante, pero jugó un papel importante en la determinación y preparación del nuevo formato. Morán no participó en la decisión de cambiar las escrituras, sin embargo, sabía, al igual que Lavastida, que algunas liberaciones no se habían realizado por no pagar la F.C.I.C. las sumas para ello. Con tal conocimiento fue imprudente por parte de Morán no adoptar una posición más enérgica y anteponer la conveniencia del cliente del Bufete, F.C.I.C., a la seguridad del negocio jurídico.

Como parte del trámite relacionado con los cierres de los tres proyectos, el Bufete hizo entrega a F.C.I.C. de copias certificadas de las escrituras de primera hipoteca y de los pagarés suscritos por cada comprador. La hipoteca carecía de ese rango por no lograrse aún las liberaciones de los gravámenes hipotecarios previos. Morán no autorizó este proceder. Lavastida sabía que las primeras hipotecas representadas en las escrituras eran inexistentes, pero nada hizo para impedir su entrega a F.C.I.C. Su actitud hizo posible el fraude perpetrado por esa entidad.

Ni los socios del Bufete, ni los notarios autorizantes, notificaron a los compradores de la situación que afectaba sus propiedades. Dada la función pública del notario, Castro Cros, Colón Ramery y Caparrós tenían la obligación de informar a los compradores que ante ellos comparecieron de la

subsistencia de gravámenes previos sobre sus propiedades. Su deber surgió desde el momento en que supieron la existencia de la situación. La responsabilidad de así proceder hacia los compradores es personal e indivisible, emana de su función notarial. Es preciso recordar que la responsabilidad del notario es personal e indivisible, por lo que dichos notarios no podían cruzarse de brazos a esperar que el Bufete, u otra entidad, diera a conocer los hechos. *In re Meléndez Pérez*, 104 D.P.R. 770, 777 (1976).

Dada la magnitud del fraude, los socios del Bufete también tenían la obligación de notificar directamente a los compradores afectados de la verdadera situación de sus propiedades. Después de todo, el Bufete se había lucrado con estos otorgamientos. Además, el hecho de que su cliente fuera la F.C.I.C. y no los compradores no justifica el que nada se hiciera en cuanto a éstos. La notaría es una función pública, y era la notaría del Bufete, así como las actuaciones de éste, las que habían dado visos de legalidad al proceder de F.C.I.C.

Los servicios profesionales prestados por los notarios del Bufete, al igual que los prestados por Castro Cros, fueron cobrados directamente a F.C.I.C. La F.C.I.C. cobraba a los compradores por los servicios notariales brindádosles por estos abogados. Esta práctica constituye una violación al Canon 33 del Código de Ética Profesional, que dispone:

"... Será impropio de un abogado el permitir o facilitar a una persona o entidad que no esté autorizada a ejercer la abogacía o el notariado que cobre total o parcialmente por los servicios profesionales o *notariales* prestados por el abogado...." (Énfasis suplido.)

No hay prueba de que Caparrós y Colón Ramery intervinieron en la facturación por servicios profesionales a F.C.I.C.; ni de que Morán hubiese autorizado o participado en el mismo. No podemos concluir lo mismo en cuanto a Castro Cros, quien admitió que usaba ese método de facturación, ni en cuanto a Lavastida, quien ocupaba una posición directiva en cuanto a lo que la notaría de la F.C.I.C. respecta.

CONCLUSIÓN

La conducta de otros miembros del Bufete en relación con su práctica notarial y los negocios de First Conventional fue objeto de nuestro escrutinio judicial en *In re Biaggi Junquera*, 104 D.P.R. 768 (1976), e *In re Meléndez Pérez*, ya citado. José Biaggi Junquera y Ernesto Meléndez Pérez eran socios del Bufete. José Raúl Cancio Bigas y José Andrés Cuevas, co-querellados de Biaggi Junquera en el citado caso, eran empleados del Bufete. Les exoneramos de cargos similares a algunos de los que ahora consideramos, todos vinculados a escrituras en que First Conventional tenía algún interés. Es preciso distinguir el proceder de cada uno para explicar por qué se justifica que en relación con los querellados ahora ante nos se dispongan sanciones disciplinarias.

Biaggi Junquera autorizó una sola escritura de segregación y compraventa, y una de primera hipoteca, en Moca. Cuevas autorizó una sola escritura de compraventa, y varias de primeras hipotecas, en Coamo. Cancio autorizó varias de segregación, compraventa e hipoteca en Coamo y Ponce de León Gardens. La intervención notarial de cada uno, en todos los casos, fue accidental y respondió a que el abogado encargado de esa labor no pudo asistir. En cuanto a Meléndez Pérez, éste autorizó ocho escrituras de hipoteca en Coamo. Su intervención fue también accidental, en sustitución del notario encargado de ello. Ninguno intervino en la redacción de los documentos. Nada conocían de las operaciones de F.C.I.C. e ignoraban las irregularidades en que se estaba incurriendo.

Veamos el contraste con la actuación de los aquí querellados, con la posible excepción de Morán. Lavastida estaba al tanto de las operaciones financieras de F.C.I.C., era un socio principal del Bufete y como tal estaba a cargo de su notaría. No estaba ignorante de que las escrituras preparadas por Castro Cros en relación con Coamo eran erróneas en cuanto liberaban de un gravamen hipotecario sobre un pagaré que él, Lavastida, tenía en su poder, y el cual había sido sustituido

por otro de mayor cuantía que tampoco estaba en poder de quienes se suponía autorizaran la liberación. Le constaba porque ante él se hicieron las operaciones sobre sustitución del pagaré y el endoso del nuevo pagaré por F.C.I.C. a favor de una firma extranjera. Le constaba además que en las escrituras preparadas por Castro Cros se ignoraban gravámenes hipotecarios que él, Lavastida, conocía y que fueron postergados a segunda, tercera y cuarta hipotecas en operaciones escrituradas otorgadas ante él. Su actitud negligente y permisiva fue factor que propició la conducta antiética de los otros notarios y facilitó a First Conventional manipular a su capricho los créditos y poner en grave riesgo las inversiones de los compradores de solares en los diferentes proyectos. Su tardía reacción mitiga la sanción, pero no puede justificar su exoneración.

La participación de Caparrós y Castro Cros no puede calificarse de casual o accidental. El primero intervino en varios otorgamientos en distintos lugares y fechas. Hizo adiciones después de las firmas de vendedores y otorgantes adquirentes que no fueron salvados por éstos, sin su conocimiento y mucho menos su consentimiento, pretendiendo con ello dar visos de legalidad a la operación de compraventa, no obstante que la liberación de gravámenes existentes era necesariamente condición indispensable para el consentimiento del contrato. Autorizó escrituras en que First Conventional, sin ser otorgante, se comprometía a hacer liberaciones, con el agravante de no ser de hecho acreedora de los gravámenes.

Castro Cros fue el autor del modelo de escritura que se utilizó para las segregaciones, liberaciones y compraventas de solares en Coamo Gardens. Se trataba de múltiples operaciones en que numerosas personas adquirirían solares para fabricar sus residencias. No le importó conocer el estado registral de la finca principal, que resultaba gravada con varias hipotecas no informadas en las escrituras que preparó. De hecho, las pretendidas liberaciones resultaban inefectivas. Además de preparar el modelo, autorizó como notario numero-

sas escrituras contentivas de los mencionados defectos. Nada hizo para remediar la situación una vez percatado de las irregularidades cometidas. Dio fe de tener ante sí el pagaré de $3,712,500 y anotar en él las liberaciones, pagaré que tenía Lavastida en su poder, y que había sido sustituido por uno de mayor cuantía.

La actuación de Colón Ramery, respecto a Moca fue, como en los casos de *In re Biaggi* e *In re Meléndez Pérez*, accidental. Pero no así en cuanto a Coamo Gardens, en que autorizó catorce escrituras en fechas diferentes y, una vez se enteró de que la finca estaba afecta a gravámenes que no surgían de las escrituras, omitió informar a los compradores de ello.

En resumen, existen en el caso de autos elementos de conocimiento, omisión e intervención notarial activa, esencial y pensada que no estaban presentes en los casos de *In re Biaggi Junquera* e *In re Meléndez Pérez*. Ello justifica que, a diferencia de éstos, impongamos sanciones disciplinarias. El ejercicio de la abogacía y el del notariado son dos cosas distintas. El abogado notario ha de ser escrupuloso en deslindar los campos. El abogado representa los intereses de un cliente. El notario no representa a cliente alguno. Representa la fe pública. Es el testigo por excelencia que ha de dar forma al negocio convenido, y ha de advertir a los otorgantes de los aspectos legales del instrumento que ellos otorgan y que él autoriza. El notario no es, en esa función, abogado de ninguno de los otorgantes. Parece que de esto se olvidaron los querellados Lavastida, Caparrós, Castro Cros y Colón Ramery.

La sentencia de este Tribunal refleja las sanciones mínimas para cada querellado sobre las cuales hay consenso mayoritario. Aunque consideramos que las faltas cometidas de ordinario ameritarían sanciones más fuertes, nos parecen justas las impuestas. No hubo en las actuaciones de los querellados propósito de defraudar ni de lucrarse a expensas de las irregularidades cometidas. Tampoco se pretendió favorecer y mucho menos perjudicar a determinado otorgante u otorgantes de las escrituras. Nadie ha puesto en duda la

buena fe de los querellados. El historial de cada uno no revela conducta anterior reprensible. Por el contrario, todos han gozado de excelente reputación personal y profesional. Ningún propósito vindicador serviría imponer sanciones más severas. Por todo ello, consideramos ajustadas las sanciones dispuestas por la sentencia de este Tribunal.

—O—

Opinión concurrente y disidente del Juez Asociado, Señor Negrón García.

San Juan, Puerto Rico, a 16 de julio de 1979

Ha dicho un observador, acertadamente, que desde el seno de este Tribunal se tiene la impresión y se percibe la sensación de estar permanentemente dentro del área de calma (centro) de un huracán, cuya tranquilidad, a riesgo de desaparecer en cualquier momento, es más aparente que real. Ciertamente la imagen que proyecta este foro colegiado a través de sus pronunciamientos y opiniones, a menudo no refleja el debate interno y angustioso—institucional e individual—que éstos generan como resultado de los diferentes valores, perspectivas y prioridades en la sociología y deontología jurídica que existen entre sus integrantes. *In re Rodríguez Torres*, 106 D.P.R. 698 (1978)(En reconsideración).

Para un abogado sometido a una querella disciplinaria, su caso es único, personal e insustituible. Representa la esperanza o fracaso profesional inmediato de un ser humano, lo que de por sí exige una profunda reflexión por el juzgador de todos los elementos presentes. En consecuencia, entre los asuntos más difíciles de evaluar están los relativos al problema de la conducta profesional en el ámbito de la norma ética y de la disciplina o corrección. Como miembros de un foro colegiado, existe una renuencia natural a denunciar, sostener y adoptar sanciones rigurosas, antipáticas contra y ante los ojos de

aquellos que son hermanos en la profesión.(¹) Esta actitud y laxitud de conmiseración judicial se debe a varias razones:

"Saben también que muchos de los abogados que cometen actos impropios a menudo desconocen o no están conscientes de que han actuado incorrectamente. La situación se complica no sólo porque la persona sometida al procedimiento disciplinario, a quien el juez debe juzgar, es un hermano en la profesión, sino además, porque probablemente quedaría privada de los medios de ganarse la vida. Es duro dejar desamparada a una persona que probablemente hizo esfuerzos considerables por obtener un título y licencia, sobre todo si ésta no tiene otros medios de procurarse su sustento. Es particularmente duro si se considera que otras personas también serán afectadas por la imposición de una medida disciplinaria: la familia del abogado y aquellas otras personas con quien él estaba obligado financieramente o de otra manera. Y claro las consecuencias de una suspensión permanente o temporera, y aún de una censura, no son meramente económicos. El prestigio y la reputación del disciplinado sufre grandemente." J. B. Fuster, *La Misión del Abogado en el Mundo Contemporáneo* . . ., 36 Rev. Jur. U.P.R. 628–629 (1967).

El caso de autos exige calificar la eticidad de los actos profesionales de varios abogados, en su dimensión notarial y como miembros de una sociedad, bufete o firma profesional. El carácter y la extensión de las sanciones disciplinarias que a juicio nuestro deben imponerse, nos obligan a esbozar ciertos pensamientos y enfoques sobre estos extremos.

---

(¹)La situación y apatía no es privativa del ámbito judicial ni exclusiva de la clase togada puertorriqueña. Se puede afirmar que es universal. En España se ha dicho:

"Educados como estamos, en un ambiente de juridicidad, y partidarios, como el que más de respetar el derecho de defensa para el inculpado, comprendemos que en la jurisdicción normal precisan siempre un expediente y la prueba para castigar; pero a fuer de realista, y contemplando lo que en la vida práctica sucede, hemos de admitir también que las pruebas son difíciles en la inmensa mayoría de los casos, y que cuando llega el momento de consignar en un expediente lo que en realidad saben muchas personas, compañeros o no del inculpado, la amnesia o la inhibición e incluso la abstención, hacen que la falta no pueda constar y que no pueda aplicarse el remedio." J. Ma. Farre y Morego, *Ética Profesional*, Anales de la Academia Matritense, pág. 255 (1961).

# I

Hace varias décadas resolvimos que "[n]o prohíbe la ley ni es contrario a la moral o al orden público que dos o más abogados debidamente autorizados para ejercer su profesión se obliguen a poner en común su talento, pericia y habilidad profesional con ánimo de partir entre sí los beneficios. La sociedad de abogados es una institución que ha echado raíces muy profundas en nuestro Derecho, y su legalidad hasta que surgió el presente caso jamás había sido cuestionada". *Buscaglia, Tes.* v. *Tribunal de Contribuciones*, 65 D.P.R. 9, 14-15 (1945). A su amparo, hoy en día el panorama puertorriqueño revela un número sustancial de abogados en la práctica privada desempeñándose en combinación con otros en sociedad total o parcial.(2) J. Fuster, *Los Abogados de Puerto Rico: Fundamentos para una Sociología de la Profesión Legal*, pág. 31 (1974). Muchas de estas sociedades jurídicas, conllevan expresa o implícitamente, convenios o asociaciones sobre las actividades notariales. No existe ley que así lo impida. Estas sociedades—que evitan la duplicidad de gastos e incrementan sus ingresos pues suponen el uso común de los medios materiales para el desempeño de la profesión, tales como local, teléfono, máquinas, copiadoras, archivo, personal secretarial y otros—plantean problemas peculiares en el campo de la deontología. ¿Cuáles son las responsabilidades éticas de los miembros socios en una sociedad de abogados? ¿Qué límites tiene? ¿Cómo ello afecta las sanciones disciplinarias?

Estas interrogantes, por primera vez están presentes ante este foro, en las querellas de epígrafe.

En los Estados Unidos la regla general prevaleciente reconoce que "[a]un cuando es cierto que una firma de

---

(2)El Código de Ética Profesional vigente hace referencia en varios de sus preceptos a los conceptos de "firma legal" y sociedad entre abogados. Cánones 27 y 33. Para las alternativas de asociación permisibles, véase *ABA Formal Op. 310 (1963)*.

abogados es responsable a su cliente por los actos negligentes o fraudulentos de sus miembros individuales cuando éstos actúan dentro del ámbito de su autoridad, y que cada miembro, independientemente de su participación personal en la transacción y del mismo modo que la firma, es responsable al cliente por el cobro y apropiación indebida de su dinero por uno de sus miembros, *se ha sostenido y reconocido en un sinnúmero de casos que un miembro de una firma de abogados no está sujeto a un desaforo o acción disciplinaria debido a la conducta impropia de su socio ocurrida sin su conocimiento, consentimiento o participación.*" Anno: *Misconduct of the Partner in a Law Firm as a Factor in Disbarment or Other Disciplinary Proceedings Against Other Partner*, 157 A.L.R. 613–617 (1945) (Énfasis nuestro); Mallen & Levit, *Legal Malpractice*, págs. 60–62 (1977); *Attorney's Liability for Tort of Partner*, 70 A.L.R. 1298–1312 (1976).

En principio esta regla merece nuestro endoso. Ciertamente en el campo ético un abogado no debe sufrir las consecuencias de una conducta profesional antiética e impropia de su socio si aquél no ha tenido *ninguna* intervención. Sin embargo, al evaluar situaciones de hecho de esta naturaleza, no debe perderse de vista la condición de privilegio y de jerarquía que ocupa un socio mayor o principal en una firma jurídica. Debe estar consciente de que "[p]or la propia índole de su profesión pulsa la necesidad que es madre del derecho, y toma conciencia de la vida, que a diario trata de desbordar las normas que ella misma ha creado. El bufete es un laboratorio al que es necesario ubicar dentro de las normas existentes." J. B. Iturraspe, *Función Social de la Abogacía*, 120 (1967). La cualidad medular que distingue al notario, preste sus servicios o no en una sociedad de abogados, es la de "ser imparcial y actuar en la colisión de intereses en plano superior al de las partes, como señor y árbitro de la lucha, con la mira puesta en los fines morales y lícitos." G. Palomino, *Derecho Notarial*, pág. 262 (1948); en igual sentido, Fernández, *Tratado de Notaría*, Vol. I, pág. 297 (1895). Independientemente de su

jerarquía en una sociedad de abogados, nunca debe empañar su reputación y honor, pues "ningún Notario debiera doblegarse a que su función pueda ser instrumento de la mentira, de la injusticia o de la impertinencia social. . . ." M. Otero Peón, *Algunos Problemas Deontológicos y de Otra Indole en el Notariado*, 46 Rev. Der. Not., pág. 183 (1963). En todo momento viene obligado a actuar recta y escrupulosamente, rechazando toda noción de servilismo o condicionalismo de parte de los clientes o de sus propios socios. Jamás debe olvidar que es un "[t]estigo prácticamente inapelable de la verdad, así en el orden especulativo como el práctico, su competencia es fundamentalmente de orden ético". J. Alonso Vega, citado por M. Guimera Peraza, *Moral Profesional del Notario*, 28 Rev. Der. Not., pág. 248 (1960). Esta búsqueda y observancia de la verdad juega un papel esencial para el Notario. E. Díaz de Guijarro, *La Fe Pública Notarial y la Interpretación de la Ley*, 16 Anales Academia Matritense del Notariado, págs. 27–28 (1968); J. Gastalver y Gimeno, *La Formación de Notario, op. cit.*, Tomo 4, págs. 496–500 (1948).

"El Notario tampoco ha de ser carcax de donde puedan tomar armas los malvados para asestarlas contra los hombres de bien, ni escudo protector de infamias y despojos: la fe pública es un auxiliar de la verdad y de la justicia, pero no su enemiga. Así, cuando evidentemente los requirentes se propusieran otorgar algún contrato en perjuicio de tercero, como en fraude de acreedores o en el de la esposa de alguno de ellos, el Notario está moralmente obligado a desenmascararles, a hacerles comprender la iniquidad que tratan de cometer, y, en último término, a negar su intervención en el asunto." Fernández, *op. cit.*, pág. 295.

Con esta perspectiva en mente, no podemos olvidar las siguientes características peculiares de una sociedad de abogados que afectan los principios de deontología profesional: (a) se presume que la información confidencial de un cliente a un socio es conocida y compartida por los restantes

socios;(³) (b) es axiomático que lo que un miembro de una firma o sociedad no puede hacer, ésta tampoco;(⁴) (c) la sociedad constituye una asociación donde la comunicación, cooperación y el intercambio del conocimiento e ideas, es común y necesario;(⁵) (d) existen consideraciones especiales, resultantes de la obligación fiduciaria particular—entre el abogado y cliente, asentadas sobre una base de confianza— que hacen de una sociedad de abogados una institución distinta a una común y regular;(⁶) y (e) a un socio le está vedado violar los cánones, por medios indirectos o mediante el empleo de terceros.(⁷)

En términos generales, somos de opinión que existe un deber deontológico general implícito en una sociedad de abogados, que recae sobre sus socios de velar y determinar que la práctica y métodos seguidos por todos en la sociedad están a tono con el Código de Ética. Creemos que esta obligación no puede quedar diluida o inmersa en la burocracia oficinesca o pluralidad de abogados. Por ende, no podemos compartir la tesis de que el abogado, cuando se desempeña en sociedad jurídica—en su condición de socio o como empleado— puede actuar aisladamente en una especie de comportamiento sellado, ajeno y alejado de los asuntos generales profesionales y notariales en que se desenvuelve la asociación. En este sentido corresponde a los socios, en la ordenación de las labores y organización internas, diseñar los mecanismos para mantenerse informados entre sí, y a aquellos otros abogados que laboran en el bufete, de detalles concernientes a los

---

(³)*Fred Weber, Inc.* v. *Shell Oil Co.*, 566 F.2d 602 (1977); *Schloetter* v. *Railoc of Indiana*, 546 F.2d 706, 710 (1976); *People* v. *Srigsby*, 365 N.E.2d 481 (1977); *Laskey Bros. of W. Va., Inc.* v. *Warner Bros. Pictures*, 224 F.2d 824, 828 (1955); *Fed. Sav. & Loan Ins. Corp.* v. *Fielding*, 343 F.Supp. 537, 544 (1972).

(⁴)*Telos, Inc.* v. *Hawaiian Tel. Co.*, 397 F.Supp. 1314, 1318 (1975).

(⁵)*Cook* v. *Brundidge, Fountain, Elliot & Church*, 533 S.W.2d 751 (1976); *Application of Lester*, 386 N.Y.S.2d 509 (1976).

(⁶)*G.A.C. Commercial Corp.* v. *Mahoney Typographers, Inc.*, 238 N.W.2d 575, 577 (1975).

(⁷)Preámbulo, *in fine*, de los Cánones.

nombres de clientes para evitar infracciones éticas por posibles conflictos de intereses y otros extremos. T. Voor Hees, *Law Firms & Professional Responsibility*, The Practical Lawyer, Vol. 22, No. 6, pág. 75 (1976). El efecto de esta interpretación es la de intercalar en los cánones, doquiera que aparezca la palabra "abogado" la expresión "o sus asociados". Véase *Unchanging Rules in Changing Times: The Canons of Ethics and Intra-Firm Conflict of Interest*, 73 Yale L.J. 1059 (1963–64).

Al concentrar nuestra atención en tan delicado aspecto, no podemos perder de vista al joven abogado que lleno de entusiasmo e ilusiones ingresa para compartir, en calidad de empleado o socio menor, a una sociedad o bufete ya establecido. Con ellos el abogado de experiencia tiene el deber de guía y maestro. La "obligación en el terreno educativo es todavía mucho más amplia, por cuanto debe referirse a todas las personas que pasan por nuestros despachos, incluidas, sobre todo, aquellas a las que hay que decir: '*Esto no se puede hacer*'." J. A. Molleda, *Perfil Comunitario de la Ética Notarial*, 87 Rev. Der. Not. pág. 113 (1977). "Correlativo deber nace para los abogados veteranos de guiar y asesorar a los más jóvenes, en los difíciles momentos de su iniciación de carrera." R. Horacio Viñas, *Ética y Derecho de la Abogacía y Procuración*, pág. 267 (1972). Ciertamente existe la obligación de brindar consejos apropiados y buen ejemplo a aquellos abogados que por falta de experiencia no han alcanzado la plena madurez y perspectiva de la amplitud de principios éticos no escritos.

"Cada abogado es un espejo en que se refleja la imagen de la profesión. Sus actuaciones reflejan ante la comunidad las bases del concepto que ésta se forme, no solamente del abogado en particular que actúa, sino también de la clase profesional toda que debe representar con limpieza, lealtad, y el más escrupuloso sentido de responsabilidad. El querellado ha sido abogado por cuatro décadas. *Es precisamente hacia la veteranía de los años que miran los que se inician en el noble apostolado de la abogacía. Miran hacia los más viejos en la práctica para leer en sus experiencias lo que no dicen los*

*libros de texto.* Por eso, cada abogado debe tomar consciencia de que su responsabilidad profesional es un magisterio." *In re Coll Pujols,* 102 D.P.R. 313, 319 (1974). (Énfasis nuestro.)

## II

En el caso de autos, en la atención de los asuntos de un cliente corporativo que generaba sustanciales ingresos al bufete a que pertenecían los querellados,[8] unos en calidad de socios y otros de abogados empleados, se cometieron serias infracciones a la Ley Notarial y en la gestión profesional de abogado. El bufete consistía de aproximadamente diez (10) abogados, entre socios y empleados, suficientemente pequeño para que todos tuvieran oportunidad de estar enterados de lo que acontecía en la gestión profesional. Las violaciones directas surgieron en ocasión de omitir el notario fedatario: (a) su deber de ilustrar y dar consejo imparcial a las partes, *In re Meléndez Pérez,* 104 D.P.R. 770 (1976); (b) faltar a la verdad certificando y dando fe de constancias y hechos que no acontecieron en su presencia y que eran falsos; y (c) incorporando en las escrituras declaraciones de partes que no comparecieron en el otorgamiento. La situación aunque nueva por el número de abogados notarios involucrados, es el resultado del cambio que ha experimentado la gestión notarial en nuestro país, al ocurrir una "mutación máxima en su actividad profesional [que] se deriva del hecho de que la contratación individual ha sido sustituida—va siendo en buena parte sustituida—por la contratación masiva. . . . La característica fundamental de la denominada contratación masiva se encuentra en otra parte: en el hecho de que uno de los contratantes lo es profesionalmente y, por tanto, contrata con *muchos.* Para una de las partes, el contrato es una operación mercantil, acostumbrada, repetida, conocida, rutinaria, única, desconocida, importante—a veces decisiva—

[8]Excepto el abogado notario Athos Castro Cros quien actuaba por su cliente Coamo Garden Development Corp., pero en relación con algunos de los asuntos relacionados con el mencionado bufete.

para su existencia personal o familiar." L. Figa Faura, *La Función Social del Notario*, 79 Rev. Der. Not., págs. 10–11 (1973).

Estas nuevas circunstancias y tipo de contratación contemporánea, va acompañada del siguiente reto:[9]

"Puede, seguramente, afirmarse que la imparcialidad del Notario no fue en otros tiempos difícil; era suficiente, en la mayor parte de los casos, dada la semejanza de las partes contractuales, dar lo mismo a ambas. Lo mismo en consejo, en advertencia, en instrucción. Pero si lo que caracteriza la contratación actual es la distancia existente entre ambas partes—entre vendedor y comprador, entre prestamista y prestatario—, la tarea se vuelve difícil. El Notario se encuentra ante el denominado 'cliente poderoso'— poderoso económicamente, poderoso en conocimientos jurídicos y en asesorías de toda clase, poderoso en capacidad negociadora—, exigente, reclamador de facilidades—para él—, deseoso de concluir rápidamente con cada asunto, de allanar cualquier singularidad molesta o entorpecedora, de tratar con contratos hechos en serie y de entendérselas con clientes hechos—y si no están hechos así, tratados—en serie. Pero, simultáneamente, se encuentra con el cliente a secas, con el cliente jurídicamente—y muchas veces no sólo jurídicamente—indigente; con el cliente que quizá por primera vez pisa una notaría, que quizá por primera vez entra como sujeto activo en el mundo del Derecho Privado.

Éste es el reflejo en nuestros despachos de la forma actual de contratación. Y su peligro es evidente: el de que el Notariado, por primera vez en su historia, falte a su fundamental deber de imparcialidad. Peligro grande, porque el Notario tiene que optar entre el fuerte y el débil, entre la facilidad y la dificultad; y, por encima de todo, por la tentación que surge de tratar al prójimo como 'elite', con todas las alusiones a una pretendida superioridad cultural y moral que este concepto lleva consigo." Figa Faura, *op. cit.*, págs. 16–17.

Y coincidente con este análisis, Molleda comenta:

"El caso del que Luis Figa—una vez más cabalmente—denomina

---

[9]Aun a riesgo de la crítica—con el objetivo de que no pierdan valor los conceptos, ideas y argumentos vertidos sobre tan importante tema—en el desarrollo de esta ponencia hemos optado por transcribir íntegramente muchas de las expresiones originales de sus autores.

'cliente poderoso'. Es el caso de la gran inmobiliaria o del constructor potente que construye muchas casas para venderlas por pisos. Es el caso de los grandes grupos o 'clanes' económicos que controlan muchas y diversas sociedades dedicadas a los más varios negocios. Como quiera que tales clientes determinan para 'su'—atención a la palabra 'su'—Notario unos rendimientos excelentes, hasta el punto de constituir, en muchas ocasiones, la espina dorsal de los rendimientos de la Notaría, tales clientes propenden a que 'su' Notario les dé las mayores facilidades posibles e imposibles y el Notario se siente tentado—y con cierta frecuencia, por desdicha, se deja vencer por la tentación—de dar tales facilidades (anteponer los asuntos de esa clientela, admitir punto menos que a ciegas y sin chistar las más disparatadas minutas de escrituras o el establecimiento de pactos leoninos, seguir el sistema de las firmas en serie y 'a posteriori', etc., etc.). A las veces—en concreto, en el caso de las inmobiliarias o constructores—, la práctica resulta más deplorable, porque frente al 'gran' cliente aparece, como contraparte, el más o menos humilde comprador de los pisos que aquel construye, un comprador a fuerza de difícil ahorro, ignorante del Derecho, al que se le impone una contratación 'en masa'. Estos casos son los que constituyen el objeto de la meditación de Luis Figa en su reciente trabajo tantas veces citado, al que me remito. Baste con decir aquí que, frecuentemente, el humilde comprador que compra al constructor poderoso sale de la Notaría—que él no ha elegido—en donde ha firmado la escritura de su piso sin haberse enterado del contenido—que le ha sido impuesto—de tal escritura, porque nadie se lo ha explicado, aunque se lo dieran para leer, y sin que él se atreviera a pedir explicaciones, muy probablemente por confianza en el Notario. Esto es, evidentemente, una clara vulneración de la ética notarial en cualquiera de sus dimensiones, pero a mí me interesa destacar ahora, especialmente, como las descritas actuaciones notariales ante el 'cliente poderoso', aparte de implicar un grave incumplimiento de nuestro deber de imparcialidad y suponer una notoria injusticia—inspirada a veces en meros móviles económicos—, son absolutamente ajenas al 'bien común' y contribuyen en muy alta medida a la mala educación—en relación con el 'cliente poderoso'—y a la falta de la debida educación—en relación con el cliente humilde—desde el punto de vista jurídico-notarial". J. A. Molleda, *op. cit.*, págs. 119–120.

En los casos de autos, el cliente poderoso de la sociedad jurídica *Blanco Lugo, Morán y Lavastida* era First Conventional Investment Corporation (F.C.I.C.), entidad dedicada al

negocio de corretaje en el financiamiento de proyectos residenciales e hipotecas. Para el abogado notario Athos Castro Cros, era la constructora Coamo Gardens Development Corporation. En ambas situaciones y con referencia a las transacciones notariales envueltas, estos clientes seleccionaron el notario.[10]

## III

En el notario puertorriqueño, por su condición de abogado, se funden dos facetas esenciales en la administración de la justicia. La *primera,* la que surge como profesional del derecho, preparado académica e intelectualmente para las lides forenses y comparecencias ante foros adjudicativos. Como tal está versado en la técnica jurídica y capacitado para dar consejos y servir de guía a todo interesado, no sólo en este rol, sino en el de notario. En su segunda faceta, la de notario, es funcionario público investido de autoridad y con capacidad autenticadora y legalizadora en el plano de las relaciones privadas, imponiendo a los actos que ve y oye—*visu et audit*—una eficacia autenticadora cubierta con una presunción de veracidad, producto neto que parte del supuesto de un leal acatamiento de los requisitos y formalidades de ejercer con fidelidad su encomienda.

En el pasado hemos reconocido la necesidad de darle contenido y fortaleza a los valores éticos dimanantes de esta doble función. *In re Vélez,* 103 D.P.R. 590, 597-598 (1975). Por razón de la naturaleza del poder autenticador y legalizador, la actuación del notario ha de ser inmediata y personal. Ninguna otra persona puede sustituir las obligaciones que surjen relativas al otorgamiento de los documentos en presencia de las partes. Cabe no obstante, como en los casos de autos, que haya habido la colaboración de terceros abogados

---

[10]En *Pueblo* v. *Central Cambalache,* 62 D.P.R. 553, 559 (1943), resolvimos, de acuerdo a la equidad, que "salvo pacto en contrario y mientras no se demuestre la existencia de usos y costumbres en distinto sentido, es el comprador y no el vendedor quien tiene derecho a elegir el notario."

en la decisión de cómo enfocar la realización de los casos o en la redacción de los documentos, pero ello no sustituye la necesidad de que la actividad sea prestada ante él en audiencia notarial.

"La función [notarial] es personalísima y el convenio de unión [sociedad o bufete] no puede ser un medio de burlar las normas correctas de la actuación profesional. Lo que sí es posible es que el documento haya sido preparado por un Notario, y en el momento de la firma sea autorizado por otro y para su protocolo, *previa califica-ción de su contenido por el autorizante.*" F. Monet y Antón, *El Notario Ante el Mundo Contemporáneo*, 65 Rev. Der. Not. (1971). (Énfasis nuestro.)

El doble aspecto que representa, como profesional del derecho, todo abogado-notario, tiene unas consecuencias particulares en la evolución de la deontología notarial. Históricamente, nuestros cánones para regular el ejercicio de la profesión de abogado han sido tomados de aquellos adoptados por la Asociación Americana de Abogados (A.B.A.). La diferencia conceptual y profesional del ejercicio de la notaría en los Estados Unidos, ha hecho posible, sin quererlo, que las normas éticas sobre el notariado del país estén sumergidas con aquellas que corresponden propiamente al abogado. El énfasis, publicidad e importancia ha sido sobre el Código de Ética Profesional, olvidándonos de la existencia propia de la Deontología Notarial,[11] independientemente de que aceptemos, según veremos, que su ámbito constantemente roza y converge— y en ocasiones es idéntico—con la doble esfera de actuación de abogado-notario.

---

[11] "[S]erá suficiente señalar como guía que en la Deontología veo el estudio de los deberes, de todos los deberes, éticos y jurídicos de Notario. Su fundamento hemos de inquirirlo en las propias normas jurídicas y éticas, elevándonos desde las normas positivas a las normas éticas o normales, inmediata y mediata. El contenido lo considero, integrado por los supuestos de carácter general y los supuestos de carácter específico, que afectan a las distintas facetas y esferas de actuación que cabe considerar en la del notario." A. Álvarez Robles, *Guión de un Ensayo Sobre Deontología Notarial*, 7 Anales de la Academia Matritense 10 (1953).

Como fuente de información conceptual y principal y lectura ilustradora, hemos consultado y seguido el esquema contenido en las págs. 46–105 de esta obra.

Conforme los estudios más reputados de la notaría, ésta comprende dos supuestos, unos generales y otros específicos.

A. *Supuestos generales*

(1) *Probidad:* Comprende una rectitud de ánimo, integridad y honradez en el obrar. Aunque común a todas las profesiones, se ha dicho:

"[L]o es de manera muy singular en la profesión notarial por la razón bien patente de que en casi todas las demás profesiones cabe un control jerárquico y externo que pueda amortiguar los efectos perniciosos de la falta de aquél, mientras que la profesión notarial en muchos de sus aspectos es tan íntimamente individual del fedatario, que no cabe más que el propio y personalísimo *self-control,* cuya eficacia depende natural y exclusivamente de la calidad moral del auto-controlado. El requisito de honestidad, probidad y moralidad para el Notario, ha sido exigido como axiomático en el ordenamiento legal y en la práctica de todos los tiempos. . . ." Alvarez Robles, pág. 48.

(2) *Capacidad Profesional:* Denota la idea descriptiva de una persona con formación, competencia y destreza jurídica necesarias.

(3) *Diligencia:* Significa poner cuidado y actividad—con los medios lícitos necesarios—para ejecutar y lograr una cosa.

" 'Pero ni la probidad ni la capacidad darían su rendimiento si se redujesen a meras potencias. Lo que las hace fecundas es el actualizarlas y proyectarlas sobre la realidad práctica, y esto no se consigue más que con la diligencia para aplicar sus valores.' Diligencia supone aplicación práctica con atención y, además, con medida de las exigencias de la vida, que en todos los asuntos, y singularmente en los de la profesión notarial, son sencillamente las exigencias del tiempo, de la prisa y del vértigo de la época en que nos ha tocado existir, y contra el cual es tan inútil luchar como contra los movimientos cósmicos. Esto es tan evidente que huelga entrar sobre el particular en mayores esclarecimientos.

Lo que hemos dicho hasta ahora de la probidad, de la capacidad y de la diligencia entra en un orden de consideraciones que pudiéramos decir de doctrina general y de regulación positiva. Hay que mirar ahora con un ángulo de visualidad deontológica y moral. Hemos distinguido más arriba los que calificábamos actos del

hombre, actos humanos y actos morales. *Para que los efectos del acto humano sean atribuibles al hombre, y cuando el acto se califica como moral, además de atribuibles, le sean imputables, ha de tratarse de efectos previstos por el agente, voluntariamente causados por el mismo y que, además, no hayan podido ser evitados.*

Por consiguiente, para que los efectos seguidos de las desviaciones en materia de probidad, capacidad y diligencia puedan ser atribuidos e imputados al Notario y, por ende, puedan constituirle en situación de responsabilidad cuando hayan dado lugar a un daño que así producido será real e injusto y obligará, consiguientemente, al justo resarcimiento, *habrá de tenerse en cuenta esta norma, referente a los efectos previstos, voluntariamente causados y que no han podido ser impedidos.* En materia de probidad jugarán así estas normas, porque toda falta de probidad constituirá una acción u omisión, desde luego, moralmente culpable y causante del supuesto daño. En materia de capacidad, la causa del daño radicará en la ignorancia vencible y no vencida. *Y en materia de diligencia, dicho daño vendrá producido por la falta de cuidado, o sea la omisión moralmente reprobable. . . .* El dolo y la culpa hacen referencia a desviaciones en materia de probidad; la ignorancia inexcusable, a las que puedan producirse en materia de capacidad profesional, *y bajo la culpa pueden encuadrarse las faltas de diligencia.*

Este precepto legal, perfectamente encajado dentro de las consideraciones doctrinales sentadas con un criterio deontológico moral, hay que extenderlo a todos los actos y contratos, no sólo a aquellos que son susceptibles de inscripción, y a los que se contrae el artículo mencionado." Alvarez Robles, págs. 53–54.

(4) *El Secreto o Discreción Profesional:* Es fundamental y se extiende al conocimiento obtenido en virtud de actos o contratos y los hechos relacionados—principales o incidentales—en que ha intervenido el notario en su gestión como tal o como persona particular.

(5) *Responsabilidad Notarial:* Se visualiza en una dimensión tripartita: *penal,* proveniente de los preceptos legales pertinentes; *civil,* que cubre "hechos propios como por hechos ajenos, cuya supervisión, evidentemente, le obliga"; y *disciplinaria,* que corresponde al mundo de la moralidad y eticidad. Sobre este último extremo, "la ley moral es más rigurosa en materia de causalidad virtual e incluso porque en

doctrina moral muy corrientemente se acepta la doctrina del abuso del derecho como causa de responsabilidad. . . ." Alvarez Robles, págs. 68 y 71. "La moralidad es cuestión de justicia fundamentalmente, aunque el Derecho positivo sea impotente para traducir normativamente la justicia. En ésta se condensa la moral, porque la práctica va más allá de la Ley, de la legalidad." A. García-Bernardo Landetta, *Las Actas y los Requerimientos Notariales, Sus Problemas Deontológicos y Reglamentarios*, 79 Rev. Der. Not. 357-348, 325 (1973).

B. *Supuestos específicos*

Los supuestos deontológicos que con mayor particularidad se evidencian en el ejercicio de la notaría son:

(1) *La Veracidad:* Esta característica la hemos enfatizado previamente a través de esta opinión. Como situaciones que pueden afectar la observancia del valor ético sobre la verdad, se reconocen en el campo notarial:

"La *falsedad civil* es reputada por dicho autor bien distinta, porque supone la falta de alguna de las solemnidades o circunstancias exigidas por la ley para que un documento haga fe en juicio. Se trata entonces de una falta de eficacia legal o de autenticidad, y a esta falsedad civil cabría añadir doctrinalmente la culposa, eliminándolas a una y otra de la órbita del derecho penal.

La responsabilidad penal produce siempre una responsabilidad criminal, y produce lógicamente, como derivada, también una responsabilidad civil. La falsedad civil no puede producir más que responsabilidad civil.

En el terreno moral se habla de falsedad, pero suele hablarse más corrientemente por los tratadistas de Filosofía moral de *mentira*, o sea locución contra el pensamiento, entendiéndose por locución, revelación al exterior, a otros, mediante signos o instrumentos convencionales al efecto, y distinguiéndose la mentira en jocosa, útil y perniciosa, según su virtualidad y efectos. Se señalan como *requisitos de la mentira*, voluntad de decir una cosa falsa, locución y significación contraria al pensamiento, resultando de todo este concurso el engaño. Como observamos, si en la mentira queda excluida siempre la buena fe y existe una mala fe dolosa, el daño no es requisito universal, pudiendo faltar en alguna de sus especies. La mentira es la negación y lo más opuesto a la veracidad,

ya se considere ésta activamente, como el deber de decir la verdad, ya pasivamente, como el derecho de todo interlocutor a que se le diga siempre la verdad.

Como figuras cercanas a la mentira, pueden concretarse las siguientes:

1. El llamado *falsiloquio*, introducido por Hugo Grocio o locución contra mente, cuando los interlocutores no tienen derecho a la revelación, aunque, por otra parte, no se dañe y se pueda evitar un mal.

2. La *restricción mental*, por la que internamente se da a la expresión externa un sentido o alcance distinto del natural y obvio, dejando incompleta la frase o atribuyéndole un significado extraño. Es *pura* si en aquellas circunstancias concretas no puede entenderse el sentido verdadero, y es *lata* en caso contrario, aunque de hecho probablemente se le dará la interpretación y el sentido aparente.

3. La *evasiva*, en la que se manifiesta la verdad, pero sólo parcialmente o en un aspecto distinto del que interesa al interlocutor; y

4. La *anfibología*, que fomenta el equívoco empleando palabras de doble sentido.

La mentira, por ser locución contra mente, contra la naturaleza de la palabra y contra el fin natural de la intercomunicación que esa palabra establece, repugna evidentemente a la naturaleza racional humana y a las normas que de ella inmediatamente se derivan, y atenta, por tanto, siempre y en todo caso contra la ley natural. No valga defenderla cuando violentamente se le quiere a uno arrancar una revelación, como decía Rosmini, porque aun en ese caso es antinatural, ni se pretenda cohonestarla con la razón de Estado, como se deduce de aquel texto de Platón que dice, que a los magistrados, con preferencia a toda otra persona, les corresponde mentir, engañando al enemigo o al ciudadano por el bien de la República. Porque la mentira, como antinatural, no cabe ni aun en defensa de las causas más altas de la República, invocadas en el texto del diálogo platónico de ese nombre.

Lo propio, y por las mismas razones, hay que decir del falsiloquio, pese a la buena intención con que se emplea y a que sea innocuo, porque atenta, al fin y a la postre, contra la veracidad activa y pasiva. Lo mismo cabe afirmar de la restricción mental pura, y únicamente la restricción mental lata, la evasiva y la anfibología pueden ser permitidas, siempre que no se cause daño, se produzca un bien y exista un motivo proporcionado, o sea, en una palabra,

aplicando, en términos generales, la norma anteriormente explicada del doble efecto.

Innecesario es decir que al Notario le está vedada toda clase de falsedad y mentira y el empleo de todas esas figuras ilícitas que anidan en los aledaños de ésta y a que acaba de hacerse referencia. . . .

*Es indudable aquello de que la verdad a medias no es la verdad, y por ello el Notario no sólo ha de reflejar la verdad, sino toda la verdad. Y toda la verdad será, en el primer caso, el hecho completo con todas sus circunstancias, debiendo el Notario poner mucho cuidado en dar una versión completa de la verdad y de todas las circunstancias que interesen para tipificar y cualificar el hecho. Toda la verdad, en la segunda hipótesis, lo serán los extremos o detalles concretos a que se contraiga el requerimiento, y con reflejarlos exactamente el Notario habrá cumplido."* Alvarez Robles, págs. 73–75. (Énfasis nuestro.)

(2) *La Justicia:* Ante el notario, como fedatario, se plantea, a veces crudamente y otras sutilmente, situaciones que ponen en peligro este ideal. Justicia significa la "expresión de la virtud y de la norma que empuja nuestra voluntad al dar a cada cual lo que en derecho le corresponde, por lo que siempre en la justicia va implicada la idea de alteridad [*sic*] y la idea de valores reales, materiales o inmateriales." Alvarez Robles, pág. 76.

"La justicia participa también de la moral. Si la esfera del Derecho y la moral no son coincidentes, no son en cambio autónomos e independientes, ya que la valoración de los hechos humanos, antes de ser jurídica, es humana, esto es moral." B. Biondi, *La Ciencia del Derecho como Arte de lo Justo*, 9 Anales de la Academia Matritense 353 (1957).

Al notario le incumbe el ideal de justicia al otorgar fórmulas y negocios contractuales y aconsejar en sus dimensiones de: (a) *justicia legal*, ello por su condición de asesor y perito de la técnica jurídica; (b) *justicia distributiva*, que se desenvuelve en el área de preparación y formalización de negocios de liquidación y división de instituciones tales como herencia, sociedad, etc.; (c) *justicia conmutativa*, reguladora de la igualdad o proporción que debe haber entre las cosas en ocasión de darse o permitirse unas por otras. Ésta se mani-

fiesta en "materia de justo precio, justo interés, justa renta...
y el interés que reviste velar por la sinceridad y exactitud de
consignación de valores materiales cuando cualquier adultera-
ción de los mismos puede acarrear el día de mañana, y más en
posibles contiendas judiciales, daños muy serios"; y (d)
*justicia social*, hija del "deber de prestar cuanto está de su
parte para el bien común colectivo."

(3) *Especial Preocupación Frente a los Problemas de
Equilibrio de Interes y de Índole Fiscal:* Bajo este supuesto
emerge la importancia de la idea de "buena fe" que Carnelutti
compendió en la frase "más que hombre de Derecho el notario
se considera hombre de buena fe." F. Carnelutti, *La Figura
Jurídica del Notario*, 8 Anales de la Academia Matritense
396 (1954).

(a) Sobre el primer supuesto, se visualiza la prudencia y
la ponderación como un deber ético del notario de orientar a
las partes en un contrato de larga duración—en previsión de
un desequilibrio económico y monetario producto de los
cambios—sobre la inclusión de "pactos de garantía de per-
manencia del equilibrio concertado" con el objetivo de man-
tener frente a los riesgos la equivalencia de los valores de las
prestaciones convenidas. Por no formar parte necesaria de
esta ponencia, no hemos de extendernos, aun cuando debemos
señalar que *"cuatro ideas* sobre las cuales hay que auscultar
el latido moral, las ideas de *contrato, riesgo, ley y estipulación.*"
Alvarez Robles, pág. 85. La función del notario no es la de
obligar a los otorgantes a ultranza a insertar una cláusula al
efecto sino del "notario aconsejar, si de él se solicita una
opinión." *Id.*, pág. 88.

(b) En cuanto a este segundo supuesto, la síntesis es que
ante los problemas de índole fiscal, el notario debe abstenerse
de aconsejar y redactar contratos que conlleven fraude con-
tributivo o ilicitud.

## IV

A la luz de los principios deontológicos expuestos y en virtud de los hechos considerados probados por el Comisionado—luego de tomar en cuenta las objeciones formuladas por los querellados—concurrimos con la Sentencia del Tribunal, y por resultar las sanciones disciplinarias comprendidas dentro de las mayores que impondríamos, nuestro voto se ha unido a la misma a esos únicos efectos. No obstante, disentimos de lo limitado de tales sanciones por estimar que todos incurrieron en faltas profesionales graves que justifican la suspensión del ejercicio de la abogacía graduado su rigor en cada caso particular tomando en cuenta elementos valorativos tales como: grado de participación; naturaleza y número de faltas notariales; conducta impropia; status en el bufete; carácter de conocimiento: ¿real o imputado?; y medida adoptada para prevenir la infracción. *In re Villamil Higuera*, 104 D.P.R. 310, 319–321 (1975). Como atenuantes procede ponderar si el querellado admitió o no el cargo, experiencia y sus antecedentes morales. *In re Piñero*, 77 D.P.R. 496 (1953).

En aras de aclarar el prisma, en justicia, debemos partir de la premisa establecida de que ninguno de los querellados, fue parte beneficiada con dineros provenientes directamente del timo que se llevó a cabo en la venta de las viviendas de los varios proyectos donde participó F.C.I.C. La estafa habría de perpetrarse completamente al margen de éstos, aunque es preciso reconocer que la pobre práctica notarial y profesional observada hubo de facilitarla inintencionalmente y que derivaron emolumentos notariales de ello.

En otras palabras, los querellados abrieron brecha al fraude sin intención porque su ingerencia nunca estuvo dirigida a defraudar. Concibieron, diseñaron e implementaron una mecánica operacional notarial, de su faz legal, creadora de una estructura adecuada para los momentos de estrechez financiera momentánea en que ocasionalmente se viera incursa su cliente F.C.I.C. Algunos fallaron en la observancia de la fe notarial. Es tras ese objetivo y no otro que se cruzó el

jalón que diferencia lo correcto de lo éticamente impropio. En consecuencia, somos de criterio de que ninguno de los querellados es coautor de delito penal alguno de fraude o apropiación ilegal y que su responsabilidad se refiere exclusivamente al campo de lo civil y disciplinario.

También hemos de repetir nuestra posición de que no nos parece jurídicamente correcto imponer responsabilidad *ética* a un socio—a manera de "respondeat superior"—por las actividades impropias y antiéticas de sus subalternos a menos que éste tenga conocimiento. La responsabilidad vicaria es propia del campo de la culpa aquiliana (*torts*) pero no de la ética. A cada abogado se le ha conferido un título para ejercerlo a tenor con las experiencias morales que la sociedad demanda.

"La categoría moral depende sólo de la voluntad o del libre albedrío y no tiene grado y extensión. O se tiene o no se tiene. Lo primero, es honor. Lo segundo, felonía." Diego Hidalgo, citado por J. Vallet de Goytisolo en *La Misión del Notario*, 16 Rev. Der. Not. 407 (1957).

De la misma manera que no puede excusar su responsabilidad por el hecho de que actuaba por delegación de un superior, tampoco puede transmitir a éste su desidia por el solo hecho de que su actividad le genera a aquél ingresos de cualquier cuantía.

No podemos olvidar que al ofrecer estos servicios de notaría a través de sus abogados empleados, la sociedad o firma jurídica *Blanco Lugo, Morán y Lavastida*, proyectaba una imagen de calidad profesional y verticalidad ética, y también debía fidelidad a los pequeños adquirentes. El bufete no podía convertirse en dócil lazarillo de su cliente poderoso F.C.I.C. como tampoco ninguno de sus socios o abogados empleados podían impunemente entregar su albedrío y responsabilidad en los criterios de sus compañeros socios de bufete sin objetar o decir "esto no se puede, o pudiéndose, no se debe hacer". En las decisiones y actuaciones pusieron en la balanza el velar y abogar primero por los intereses del

"cliente poderoso" olvidando principios básicos de deontología profesional.

Es aplicable a la situación de autos la siguiente observación:

"Es lo cierto que, en la 'praxis' notarial española, se da el fenómeno del 'posibilismo' general, incurriéndose, con cierta frecuencia, en una especie de 'moral de situación', totalmente inadmisible, por el deseo de resolver los problemas a la gente. En esta materia, la regla moral práctica límite suele ser la de que 'en tanto no hay perjuicio para tercero, todo es notarialmente posible', una regla que es una verdadera trampa y, en muchas ocasiones, un verdadero soborno de la conciencia, porque el tercero perjudicado salta cuando y donde menos se espera, sin que el Notario pueda tener nunca 'a priori', la seguridad de que no surgirá, en los casos 'posibilitados', un perjuicio para alguien."

.  .  .  .  .  .  .  .

"En mi opinión, ese fenómeno del 'posibilismo' notarial, por desgracia tan generalizado, encuentra su raíz en una falsa perspectiva ético-sociológica de los fines de la función notarial, derivada de un error en la determinación del verdadero destinatario de nuestra función. Se cree erróneamente que los destinatarios de función notarial son los clientes que acuden a nuestros despachos y, en consecuencia, se piensa que nuestra misión es resolver, a todo trance, los problemas jurídico-privados de los mismos, cuando la verdad es, como desarrollaremos más adelante, que el genuino destinatario de nuestra función no es, ni más ni menos, que la Sociedad en su conjunto, por lo que nuestra verdadera misión es dar cauce jurídico a los intereses privados en tanto en cuanto quepa algún cauce jurídico—en cuya búsqueda no debemos regatear esfuerzo alguno—, pero sólo en tanto en cuanto quepa algún cauce jurídico positivamente valorado en el terreno de la ética." J. A. Molleda, *op. cit.*, págs. 117–118.

Finalmente, en torno al cobro de honorarios, el Canon 33 terminantemente prohíbe la práctica seguida por el bufete de repartirlos con F.C.I.C. *Pueblo* v. *Central Cambalache*, supra, pág. 564. Los fundamentos principales que se aducen en apoyo de esta interdicción los encontramos en los siguientes extractos: "Los servicios profesionales de un abogado no pueden ser controlados o explotados por ninguna agencia

legal, personal o corporativa. Las responsabilidades y requisitos de un abogado son individuales. Él debe evitar toda relación que dirija el cumplimiento de sus deberes en interés de tales intermediarios". A. E. Parry, *Ética de la Abogacía*, Tomo 1, pág. 173 (1940). "Las profesiones liberales—dice Savatier—se oponen a las comerciales, a la vez, por su espíritu y por su modo de actividad. El espíritu de lucro es característica esencial del comercio; y aun cuando el deseo de ganancia se encuentre también en la actividad profesional liberal, hay una diferencia espiritual muy grande entre los miembros de profesiones liberales y los comerciantes. Más aún: el régimen jurídico de las profesiones liberales *tiende a mantener aquella diferencia*". R. Larraud, *Introducción al Estudio del Derecho Notarial*, 16 Rev. Der. Not. 146 (1957). Véase *Attorney-Splitting Fee*, 6 A.L.R.3rd 1446 (1966).

Siendo todos los socios acreedores a tales ganancias, ninguno de ellos puede válidamente alegar ignorancia por el acto ilegal y antiético de distribución de emolumentos con personas naturales o jurídicas que no son abogados autorizados al ejercicio de la profesión. Ello no implica que esté prohibida la aportación del esfuerzo (ingresos) por la prestación de la función notarial al fondo común de la sociedad jurídica para su ulterior distribución con arreglo a la distribución interna según las normas pactadas. El solo conocimiento constructivo, distinto del real, será factor que minimizará, pero no eliminará la sanción disciplinaria.

## V

Al ponderar los remedios correctivos al caso de autos, en adición a lo expuesto, hemos tomado en cuenta:

"El privilegio de ejercer la profesión de abogado 'no es un asunto de gracia o favor'; al contrario, como se ha dicho recientemente, 'siempre hemos visualizado la licencia de abogado como un derecho que no puede ser quitado superficial o caprichosamente de él'. También, hemos tenido presente la admonición del Tribunal Supremo de los Estados Unidos en el sentido de que el poder para

retirar ese derecho 'debe siempre ser ejercitado con gran cautela; y nunca ejercitado excepto en casos claros de conducta impropia, que afecta la capacidad y carácter del abogado como parte'. Y contrario al concepto de la Comisión, los procedimientos disciplinarios 'son de naturaleza adversativa y cuasi-criminal', y el desaforo, diseñado para proteger al público, es un castigo o pena impuesta al abogado. No debe ser sorpresa pues, que como resultado, la parte querellante tenga el peso de sostener que el abogado querellado no es acreedor al título." *Charlton* v. *F.T.C.*, 543 F.2d 903, 906 (1976).

Sobre la medida de responsabilidad y sanción disciplinaria, el *quantum* se nutre de los factores expresados anteriormente en una perspectiva apriorística. En atención a éstos, reiteramos nuestro criterio concurriendo con las sanciones disciplinarias dispuestas, por estar éstas comprendidas, *como mínimas*, en nuestro parecer de que debieron suspenderse del ejercicio de la abogacía a todos los querellados durante determinado período, proporcionado a la gravedad de las actuaciones de cada uno. Véase:[12] *In re Landing; y Aulet*, 107 D.P.R. 103 (1978); *In re Cruz Tollinche*, 105 D.P.R. 500 (1976); *In re Baigés Chapel*, 104 D.P.R. 638 (1976); *In re Félix*, 104 D.P.R. 379 (1975); *In re Ayuso Ramírez*, 102 D.P.R. 65 (1974); *In re Cid*, 102 D.P.R. 489 (1974); *In re Rivera Lacourt*, 102 D.P.R. 688 (1974); e *In re Dávila Román*, 101 D.P.R. 936 (1974).

---

[12]La falta de uniformidad en la aplicación de sanciones disciplinarias es motivo de honda preocupación entre los miembros de la profesión. E. Orsini Zayas, *La Abogacía Puertorriqueña—Análisis de su Conducta Profesional*, 40 Rev. C. Abo. P.R. 236 (1979).